36 A.3d 163

COMMONWEALTH of Pennsylvania, Appellee

v.

Ricky Lee ALLSHOUSE, Jr., Appellant.

Supreme Court of Pennsylvania.

Resubmitted Aug. 19, 2011.

Decided Jan. 20, 2012.

230

David B. Chontos, Chontos & Chontos, P.C., for Ricky Lee, Allshouse, Jr.

Marissa Boyers Bluestine, Defender Association of Philadelphia, Jules Epstein, Kairys, Rudovsky, Messing & Feinberg, Philadelphia, for Appellant Amicus Curiae, Defender Assoc. of Phil., PA Assoc. of Crim. Def. Lawyers & PD Assoc. of PA.

Jeffrey D. Burkett, Jefferson County District Attorney's Office, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## *OPINION*

Justice TODD.

This case has been returned to this Court following the March 7, 2011 *per curiam* order of the United States Supreme Court, which vacated our prior decision in this matter and remanded the case for our reconsideration in light of the high Court's decision in *Michigan v. Bryant,* —— U.S. ——, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011).

The facts and relevant procedural history are as follows.

As recounted in our prior opinion in *Commonwealth v. Allshouse,* 604 Pa. 61, 985 A.2d 847 (2009), on May 20, 2004, Appellant and M.R. ("Mother") were arguing in the home they shared with their three children. Appellant was shouting from the living room, and Mother was in the kitchen. The couple's 7–month–old twin sons, J.A. and M.A., were in a

playpen in the living room, and their 4–year–old daughter, A.A., was playing nearby. Mother's 8–year–old son, R.R., who also lived in the home, had already left for school. Mother reported to police that, at one point, she heard a "squeak" as Appellant sat on a recliner in the living room and, minutes later, she heard him get up from the recliner. She then heard J.A. crying. N.T. Trial, 9/19/05, at 46–47. As Mother ran to the living room, she passed Appellant, who was heading upstairs. Mother observed that A.A. was now in the playpen, holding J.A.'s head on her lap. When Mother picked up J.A., "his arm flopped backwards." *Id.* at 147. Mother took J.A. to the emergency room, where it was determined that he had suffered a spiral fracture to the right humerus caused by sharp and severe twisting of the arm.

Hospital officials immediately contacted Jefferson County Children and Youth Services ("CYS"), and CYS caseworker John Geist arrived at the hospital and spoke with Dr. Craig Burke, the emergency-room physician who treated J.A. Dr. Burke opined that the spiral fracture of J.A.'s arm indicated abuse. Geist then spoke with Mother, and advised her that J.A. would need to be removed from the family home pending investigation. Mother agreed that J.A. and his siblings would stay with their paternal grandparents.

On May 27, 2004, Appellant suggested to Geist that "possibly [A.A.] had caused injury to [J.A.]." N.T. Hearing, 9/16/05, at 9.[1] Accordingly, that same day, Geist went to A.A.'s paternal grandparents' home to speak with A.A. Geist and A.A. sat and talked on the front porch of the house, while A.A.'s grandparents, siblings, and others were inside. During the interview, A.A. told Geist that Appellant had caused J.A.'s injury.[2] After his interview with A.A., Geist spoke with his

---

1. *See also* N.T. Trial, 9/19/05, at 128 (Geist testified that he spoke with Appellant on May 27, 2004, at which time Appellant stated that he believed A.A. had caused J.A.'s injury).

2. In response to direct examination by the district attorney, Geist described the events of the interview as follows:

 [Geist]: I had asked [A.A.] if she could remember her brother being hurt. She stated, yes, she did. I asked her if her other brother had caused the injury. She said no. I asked her if her mother caused it.

supervisor, and the two agreed to arrange an evaluation of A.A. by Dr. Allen Ryen, a psychologist. Dr. Ryen interviewed A.A. on June 8, 2004, and during the interview, A.A. again implicated Appellant in J.A.'s injury.[3]

> She said no. I asked [her] if she caused it. She said no. I asked her if her father Ricky caused the injury. She got scared and kind of queasy and stated yes.
> Q: What did you physically observe to say she was afraid?
> [Geist]: She started shaking. Closed body language. She was looking around to see if anyone heard her statement.
> Q: All right. Go on.
> [Geist]: I asked her what she could recall, what happened to her brother. She stated that her father had done it. I asked her if she could remember how [J.A.] got the injury. She stated that—she put her hand on my arm and said [Appellant] grabbed her [sic] right above the elbow and pulled. I didn't get into much else with her because one of [Appellant's] brothers came outside, and she stopped talking.
> N.T. Hearing, 9/16/05, at 11.

3. Dr. Ryen recounted his interview with A.A. concerning the incident with J.A., in response to questioning by the district attorney, as follows:

> [Dr. Ryen]: I'm not sure I can give you a specific quote, but I said something like did something happen to your brother or something kind of open-ended like that.
> Q: And can you tell the Court—what happened from there after you asked that question?
> [Dr. Ryen]: She immediately said to me, "Daddy hurt him". And I asked her more about that. She proceeded to describe her father had been, quote, mad and, quote, grabbed and yanked [J.A.'s] arm.
> Q: Did she explain what she meant by those statements?
> [Dr. Ryen]: I asked her what she meant, and, you know, I have a lot of properties in my office, and she demonstrated on the baby doll what she was talking about. And later on, I asked her some questions, and she had me demonstrate it on her. She was the baby doll, and I was the adult, and she showed me what I should do.
> Q: And was she leading you through it?
> [Dr. Ryen]: Yes.
> Q: Could you describe her demonstration to the Court?
> [Dr. Ryen]: Basically, you know, both. What she had me do was grab her by the elbow and kind of lift and twist at the same time. Kind of like that. She did that on the baby doll and instructed me if I went that way, it wasn't right. And I finally got it right.
> Q: And she told you that it was right?
> [Dr. Ryen]: Yes.
> Q: Did she describe at that point how the baby had reacted?
> [Dr. Ryen]: She said the baby began to cry and scream.
> Q. And what else did she describe about her physical observations at that time?

On June 11, 2004, Appellant was arrested and charged with aggravated assault, simple assault, endangering the welfare of a child, reckless endangerment, and harassment. On September 16, 2005, the trial court conducted a hearing pursuant to the Tender Years Hearsay Act ("TYHA"), 42 Pa.C.S.A. § 5985.1, to determine whether the statements given by A.A. to Geist and Dr. Ryen, admittedly hearsay, were admissible under the tender years exception to the hearsay rule.[4] Under the TYHA, certain out-of-court statements made by a child victim or witness may be admissible at trial if the child either testifies at the proceeding or is unavailable as a witness, and the court finds "that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability." 42 Pa.C.S.A. § 5985.1(a)(1).

Analyzing the statements under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the trial court first noted that A.A.'s statements to Geist and Dr. Ryen fell "in between" testimonial and nontestimonial statements "because we do have some questioning." N.T. Hearing, 9/16/05, at 61. The court explained, however:

> I'm going to find it's nontestimonial for these basis [sic]. I think we have to look at what an objective four-year-old of average intelligence would think. And Mr. Geist, as he appears today, he does not have on a uniform but carries a badge, but not a badge in the sense of police work.
>
> Dr. Ryen has a psychological appointment in the office to believe that later these statements would be used in Court.

[Dr. Ryen]: That the baby wouldn't stop crying; that father tried to pick the baby up and get the baby to quiet down, but he wouldn't quiet down. And that some time later on—I'm not certain if the mother was someplace in the house—sometime later on, the mother took the baby to the hospital.

*Id.* at 31–32. In describing his interview, Dr. Ryen also noted that it was unusual that A.A. separated from her grandparents "without invitation" during the interview, and that after approximately ten minutes, A.A. was sitting on his lap and "kind of snuggling in." *Id.* at 29–30.

4. Rule 802 of Pennsylvania's Rules of Evidence provides: "Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.E. 802.

I certainly do not think for this four-year-old that she could make the determination that it would be available for use later at trial.

*Id.* at 61–62. The trial court determined that A.A.'s statements to Geist and Dr. Ryen satisfied the requirements of the tender years exception to the hearsay rule, and, under *Crawford,* would be admissible at trial.

On September 19, 2005, Appellant filed a motion for reconsideration, asserting A.A.'s statements constituted testimonial hearsay that was inadmissible under *Crawford.* Following argument, the trial judge denied the motion, reiterating his opinion that, in determining whether questioning should be deemed testimonial in nature, "you have to look at it from the 4–year–old's point of view because the concern is reliability in that regard." N.T. Hearing, 9/19/05, at 3. On September 20, 2005, a jury convicted Appellant of simple assault[5] and endangering the welfare of a child;[6] he was acquitted of the remaining charges.

On November 2, 2005, Appellant was sentenced to one to two years in prison, plus fines, costs, and restitution. Appellant filed a post-sentence motion, and a hearing on the motion was held on January 12, 2006. On March 9, 2006, the trial court denied Appellant's motion to the extent he sought judgment of acquittal on his child endangerment conviction.[7] On April 3, 2006, Appellant appealed his judgment of sentence to the Superior Court, challenging, *inter alia,* the trial court's admission of A.A.'s statements to Geist and Dr. Ryen at trial.

With regard to the issues raised before this Court, the Superior Court agreed with the trial court that A.A.'s statement to Geist was nontestimonial in nature, and thus admissible under *Crawford.* The Superior Court concluded, however, that it could not determine, based on the record, whether A.A.'s statement to Dr. Ryen was testimonial because "it is

5. 18 Pa.C.S.A. § 2701(a)(1).

6. 18 Pa.C.S.A. § 4304.

7. The trial court granted Appellant relief in reversing a restitution award of $160 payable to CYS.

impossible to determine what Dr. Ryen's primary purpose was in conducting the interview." *Commonwealth v. Allshouse*, 924 A.2d 1215, 1224 (Pa.Super.2007). Nevertheless, the Superior Court opined that it was unnecessary to determine whether A.A.'s statement to Dr. Ryen was testimonial because, even if it was, admission of the statement was harmless error since Dr. Ryen's testimony was merely cumulative of other properly admitted testimony, and there was overwhelming "untainted evidence" to support the jury's verdict. *Id.* at 1224–25.

The Superior Court declined to address Appellant's additional argument that the trial court's application of the 2004 amended version of the TYHA, which provides that an out-of-court statement of a child victim or witness under age 12 is admissible at trial if, *inter alia*, the child is unavailable as a witness and the trial court determines the circumstances surrounding the statement provide sufficient indicia of reliability, violated the prohibition against *ex post facto* laws. The Superior Court determined that, even if it did, the trial court could have admitted A.A.'s statements as nontestimonial hearsay under *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), based on a finding that A.A.'s testimony contained particularized guarantees of trustworthiness. The Superior Court ultimately affirmed Appellant's judgment of sentence in a published opinion on April 18, 2007.

Thereafter, Appellant filed a petition for allowance of appeal, and, on October 22, 2008, this Court granted Appellant's petition with respect to the following issues:

1. Does the Superior Court's decision conflict with U.S. Supreme Court precedent on the confrontation clause thereby creating a direct conflict with another Superior Court decision?

2. Did the Superior Court disregard this Court's harmless error precedent by allowing the Commonwealth to discharge its burden of proving harmless error through a two-sentence footnote?

3. Did the Superior Court decision misconstrue the reach of *Ohio v. Roberts*, 448 U.S. 56 [100 S.Ct. 2531, 65 L.Ed.2d

597] (1980), and thereby insulate Pennsylvania's Tender Years Hearsay Act from an *ex post facto* challenge? *Commonwealth v. Allshouse*, 598 Pa. 600, 959 A.2d 903 (2008) (order).

On December 29, 2009, this Court issued an opinion affirming the order of the Superior Court. In so doing, we rejected, *inter alia*, Appellant's argument that the trial court's admission at trial of A.A.'s statement to Geist violated Appellant's rights under the Confrontation Clause, concluding the challenged statement was nontestimonial because it was given during an ongoing emergency. *Allshouse*, 604 Pa. at 80, 985 A.2d at 858. Thereafter, Appellant filed a petition for *writ of certiorari* with the United States Supreme Court, and, on March 7, 2011, the high Court issued an order vacating our decision and remanding the case for further consideration in light of its decision in *Michigan v. Bryant*.[8] On May 31, 2011, this Court issued an order, *sua sponte*, allowing the parties to submit supplemental briefs to address the impact of the Supreme Court's decision. Both parties have submitted supplemental briefs; thus, we proceed to consider this case under the guidelines set forth by that Court.[9]

The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused

8. In his supplemental brief, Appellant notes that Justice Scalia, who authored the majority opinions in *Crawford*, *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), and *Hammon v. Indiana*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), has frequently criticized the United States Supreme Court's practice of issuing orders which merely "grant, vacate, and remand" ("GVR"), often dissenting to such orders. Appellant's Supplemental Brief at 27. Appellant contends that Justice Scalia's failure to note his dissent to the high Court's GVR order in the instant case is evidence that this Court's prior decision in this case was erroneous. Appellant provides no support for this bald assertion, and we wholeheartedly reject it.

9. As the Supreme Court vacated our decision in *Allshouse*, and we allowed the parties supplemental briefing only to address the impact of *Bryant*, we address herein all of the issues raised by Appellant in both his original and supplemental briefs to this Court. However, where Appellant has abandoned or modified his original arguments in light of *Bryant*, we consider only his modified argument. Accordingly, we refer to both "Appellant's Brief" and "Appellant's Supplemental Brief" throughout this opinion.

shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const., amend. VI. This constitutional protection is known as the Confrontation Clause.[10] In 1980, the United States Supreme Court, in *Ohio v. Roberts, supra,* held that the Confrontation Clause did not bar admission of an unavailable witness's statement against a criminal defendant, provided the statement was surrounded by "adequate indicia of reliability." 448 U.S. at 66, 100 S.Ct. 2531. Such indicia existed when the testimony being considered either fit within a "firmly rooted hearsay exception," or contained "particularized guarantees of trustworthiness." *Id.*

More than two decades after its decision in *Roberts,* the Supreme Court, in *Crawford v. Washington, supra,* overruled its *Roberts* decision. In doing so, the *Crawford* Court criticized the *Roberts* "indicia of reliability" test as a departure from the principles of the Confrontation Clause in two respects:

> First, it is too broad: It applies the same mode of analysis whether or not the hearsay consists of *ex parte* testimony. This often results in close constitutional scrutiny in cases that are far removed from the core concerns of the Clause. At the same time, however, the test is too narrow: It admits statements that *do* consist of *ex parte* testimony upon a mere finding of reliability. This malleable standard often fails to protect against paradigmatic confrontation violations.

*Crawford,* 541 U.S. at 60, 124 S.Ct. 1354 (emphasis original). The *Crawford* Court explained that, while it had "no doubt that the courts below were acting in utmost good faith" when finding reliability,

> [t]he Framers ... would not have been content to indulge this assumption. They knew that judges, like other government officers, could not always be trusted to safeguard the

---

10. The protection is expressly contained in Article 1, Section 9 of the Pennsylvania Constitution. Although Appellant notes in his brief that "Pennsylvania's constitution has the same confrontation language [as *Crawford* ]," Appellant's Brief at 27 n. 8, he presents no argument based on Article 1, Section 9. Thus, we express no opinion as to whether Appellant would be entitled to relief thereunder.

rights of the people; the likes of the dread Lord Jeffreys were not yet too distant a memory. They were loath to leave too much discretion in judicial hands. By replacing categorical constitutional guarantees with open-ended balancing tests, we do violence to their design. Vague standards are manipulable, and, while that might be a small concern in run-of-the-mill assault prosecutions like this one, the Framers had an eye toward politically charged cases like Raleigh's-great state trials where the impartiality of even those at the highest levels of the judiciary might not be so clear. It is difficult to imagine *Roberts'* providing any meaningful protection in those circumstances.

*Id.* at 67–68, 124 S.Ct. 1354.

Accordingly, the *Crawford* Court held the Confrontation Clause prohibits out-of-court *testimonial* statements by a witness, regardless of whether the statements are deemed reliable by the trial court, unless (1) the witness is unavailable, and (2) the defendant had a prior opportunity to crossexamine the witness:

Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. *Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.*

*Id.* at 68 (emphasis added).

The *Crawford* Court expressly declined, however, to explain the distinction between testimonial and nontestimonial statements, stating "[w]e leave for another day any effort to spell out a comprehensive definition of 'testimonial.' Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* (footnote omitted).

Two years after the Supreme Court's *Crawford* decision, the Court had the opportunity to clarify the difference between

testimonial and nontestimonial hearsay in *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). At issue in the consolidated appeal [11] in *Davis* were two separate statements. The first was a statement made by a victim of spousal abuse to a 911 operator; the second was a wife's statement to police officers dispatched to investigate a domestic disturbance, set forth in a battery complaint. In finding the statement to the 911 operator nontestimonial,[12] but the wife's statement to the police officers testimonial, the *Davis* Court set forth the following test for determining whether statements are testimonial or nontestimonial:

Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822, 126 S.Ct. 2266.

The Court acknowledged that the above definition was not exhaustive and did not address all possible scenarios—such as situations which do not involve interrogations—in which a determination of whether a statement is testimonial or nontestimonial is required, explaining:

Our holding refers to interrogations because ... the statements in the cases presently before us are the products of

11. Davis' appeal was consolidated with the appeal in *Hammon v. Indiana*, 829 N.E.2d 444 (Ind.2005).

12. In determining that the recording of the 911 call was not testimonial evidence, the *Davis* Court noted:

If 911 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they conduct interrogations of 911 callers. For purposes of this opinion (and without deciding the point), we consider their acts to be acts of the police. As in *Crawford* ..., therefore, our holding today makes it unnecessary to consider whether and when statements made to someone other than law enforcement personnel are "testimonial."

*Davis*, 547 U.S. at 823 n. 2, 126 S.Ct. 2266.

interrogations—which in some circumstances tend to generate testimonial responses. This is not to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial. The Framers were no more willing to exempt from cross-examination volunteered testimony or answers to open-ended questions than they were to exempt answers to detailed interrogation.

*Id.* at 822 n. 1, 126 S.Ct. 2266.

Following *Crawford* and *Davis,* however, courts struggled with the vitality of *Roberts* with regard to *nontestimonial* hearsay. As noted above, the *Crawford* Court suggested that nontestimonial hearsay statements might be exempt "from Confrontation Clause scrutiny altogether." 541 U.S. at 68, 124 S.Ct. 1354. In *Davis,* the Court characterized *Roberts* as having been "overruled" and noted that the Confrontation Clause's focus on testimonial hearsay must be viewed as marking not merely its "core," but its perimeter. 547 U.S. at 824, 126 S.Ct. 2266. Most emphatically, in *Whorton v. Bockting,* 549 U.S. 406, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007), the Court, in addressing the retroactivity of the *Crawford* decision, explained: "*Crawford* overruled *Roberts* because *Roberts* was inconsistent with the original understanding of the meaning of the Confrontation Clause." 549 U.S. at 419, 127 S.Ct. 1173. Noting "*Crawford*'s elimination of Confrontation Clause protection against the admission of unreliable out-of-court nontestimonial statements," the Court sounded the death knell of *Roberts:*

Under *Roberts,* an out-of-court nontestimonial statement not subject to prior cross-examination could not be admitted without a judicial determination regarding reliability. Under *Crawford,* on the other hand, the Confrontation Clause has no application to such statements and therefore permits their admission even if they lack indicia of reliability.

*Id.* at 420, 127 S.Ct. 1173.

Thus, the threshold question in the case *sub judice* is whether the statements are testimonial, for if the statements are nontestimonial, "the confrontation clause places no restric-

tion on their introduction except for the 'traditional limitations upon hearsay evidence.'" Appellant's Brief at 35 (citing *Davis*, 547 U.S. at 821, 126 S.Ct. 2266). In deciding this question, we must consider, as instructed, our Supreme Court's recent decision in *Michigan v. Bryant*.

In *Bryant*, Detroit city police officers received a radio dispatch at approximately 3:25 a.m. regarding a gunshot victim. Police discovered the mortally wounded victim, Anthony Covington, lying on the ground next to his car in a gas station parking lot. The victim had a gunshot wound to his abdomen, appeared to be in great pain, and had difficulty speaking. Police officers asked him "what had happened, who had shot him, and where the shooting had occurred." 131 S.Ct. at 1150. The victim told police he had been shot through a door by Bryant as he stood outside the back door of Bryant's home, after which he drove himself to the gas station. An ambulance arrived within five to ten minutes, and the victim was transported to the hospital, where he died several hours later. After leaving the gas station, police went to Bryant's home, where they found blood and a bullet on the back porch, and what appeared to be a bullet hole in the back door. They also found the victim's wallet and identification outside the house.

At Bryant's trial, which occurred before the Supreme Court's decisions in *Crawford* and *Davis*, the officers testified regarding the statements made by the victim. Bryant was convicted of, *inter alia*, second-degree murder, and the Michigan Court of Appeals subsequently affirmed his conviction. Bryant further appealed to the Michigan Supreme Court, which remanded the case to the intermediate appellate court for reconsideration in light of *Davis*. On remand, the court of appeals again affirmed, holding that the victim's statements were properly admitted at trial because they were nontestimonial. Bryant again appealed to the Michigan Supreme Court, which reversed his conviction on the basis that the victim's statements constituted testimonial hearsay inadmissible under the Confrontation Clause.

The United States Supreme Court granted *certiorari* and, ultimately, reversed the decision of the Michigan Supreme

Court, concluding the victim's identification and description of Bryant and the location of the shooting were nontestimonial statements because the primary purpose of the statements was to enable police to meet an ongoing emergency. Accordingly, the high Court held admission of the victim's statements at trial did not violate the Confrontation Clause. In reaching its decision, the Court found it necessary to provide "further explanation of the 'ongoing emergency' circumstances addressed in *Davis*," as well as "additional clarification with regard to what *Davis* meant by 'the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.'" *Bryant*, 131 S.Ct. at 1156 (quoting *Davis*, 547 U.S. at 822, 126 S.Ct. 2266).

The Supreme Court first discussed its prior decisions in *Crawford* and *Davis*. With regard to the latter, the Court stated:

> When, as in *Davis*, the primary purpose of an interrogation is to respond to an "ongoing emergency," its purpose is not to create a record for trial and thus is not within the scope of the [Confrontation] Clause. But there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant. Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.

*Bryant*, 131 S.Ct. at 1155 (emphasis original and footnote omitted).

The high Court then explained that a determination of whether the primary purpose of an interrogation is to enable police to meet an ongoing emergency requires an objective evaluation of "the circumstances in which the encounter occurs and the statements and actions of the parties." *Id.* at 1156.[13]

13. The *Bryant* Court noted that "circumstances in which an encounter occurs," include the location and time of the encounter. *Bryant*, 131 S.Ct. at 1156.

The Court cautioned that the focus must be on the perspective of the parties at the time of the interrogation, and not based on hindsight, for "[i]f the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for purposes of the Confrontation Clause." *Id.* at 1157 n. 8.

Suggesting that the Michigan Supreme Court both "construed *Davis* to have decided more than it did" and "employed an unduly narrow understanding of 'ongoing emergency' that *Davis* does not require," the Court in *Bryant* emphasized that "whether an emergency exists and is ongoing is a highly context-dependent inquiry." *Id.* at 1158. The Court noted, for example, that domestic violence cases, like *Davis,* often have a "narrower zone of potential victims than cases involving threats to public safety." *Id.* Thus, the Court explained: "[a]n assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue." *Id.* The Court further held "the duration and scope of an emergency may depend in part on the type of weapon employed," and that

> [t]he medical condition of the victim is important to the primary purpose inquiry to the extent it sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one. The victim's medical state also provides important context for first responders to judge the existence and magnitude of a continuing threat to the victim, themselves, and the public.

*Id.* at 1159. Finally, the Court noted, as it did in *Davis,* that "a conversation which begins as an interrogation to determine the need for emergency assistance" may "evolve into testimonial statements." *Bryant,* 131 S.Ct. at 1159.

The Court further cautioned that the existence of an emergency is not the end of the inquiry:

[O]ur discussion of the Michigan Supreme Court's misunderstanding of what *Davis* meant by "ongoing emergency" should not be taken to imply that the existence *vel non* of an ongoing emergency is dispositive of the testimonial inquiry. As *Davis* made clear, whether an ongoing emergency exists is simply one factor—albeit an important factor—that informs the ultimate inquiry regarding the "primary purpose" of an interrogation.

*Id.* at 1160.

The Court added that the formality of an encounter between a victim and the police is also an important factor to consider. Nevertheless, formality is not the "sole touchstone" of the primary purpose inquiry because, "although formality suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to 'establish or prove past events potentially relevant to later criminal prosecution,' ... informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent." *Id.*

Finally, the Court further explained that, "[i]n addition to the circumstances in which an encounter occurs, the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation." *Id.* Acknowledging that "[s]ome portions of *Davis* ... have caused confusion about whether the inquiry prescribes examination of one participant to the exclusion of the other," the Court clarified that its statement in *Davis* that "it is in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation requires us to evaluate," *Davis*, 547 U.S. at 822 n. 1, 126 S.Ct. 2266, was "not meant to determine *how* the courts are to assess the nature of the declarant's purpose, but merely to remind readers that it is the statements, and not the questions, that must be evaluated under the Sixth Amendment." *Bryant*, 131 S.Ct. at 1161 n. 11. The Court opined that such a combined approach "ameliorates problems that could arise from looking solely to one participant. Predominant among these is the problem of

mixed motives on the part of both interrogators and declarants." *Id.* at 1161.

Thus, in determining whether the Confrontation Clause precludes the admission of a statement at trial, a court

should determine the "primary purpose of the interrogation" by objectively evaluating the statements and actions of the parties to the encounter, in light of the circumstances in which the interrogation occurs. The existence of an emergency or the parties' perception that an emergency is ongoing is among the most important circumstances that courts must take into account in determining whether an interrogation is testimony because statements made to assist police in addressing an ongoing emergency presumably lack the testimonial purpose that would subject them to the requirement of confrontation.

*Id.* at 1162.

In sum, in analyzing whether a statement is testimonial, and, therefore, subject to the protections of the Confrontation Clause under *Crawford*, a court must determine whether the primary purpose of the interrogation was to establish or prove past events relevant to a later criminal prosecution. In making the determination as to the primary purpose of an interrogation, a court first should determine whether the interrogation occurred during the existence of an ongoing emergency, or what was perceived to be an ongoing emergency. Although the existence—actual or perceived—of an ongoing emergency is one of the most important factors, this factor is not dispositive because there may be other circumstances, outside of an ongoing emergency, where a statement is obtained for a purpose other than for later use in criminal proceedings. In determining the primary purpose of an interrogation, a court must also objectively evaluate the circumstances surrounding the interrogation, including the formality and location, and the statements and actions of both the interrogator and the declarant.

With the *Bryant* Court's clarification of the "primary purpose" and "ongoing emergency" concepts in mind, we now

turn to the specific arguments advanced by Appellant in support of his claim that the trial court, in admitting at trial the statements of A.A., who had not testified and was not cross-examined, violated his rights under the Confrontation Clause. The trial court, in determining that A.A.'s statements to Geist and Dr. Ryen were nontestimonial,

focused on the language quoted in *Crawford* that testimonial statements included those made under circumstances that would lead an objective witness reasonably to believe that his or her statement would be available for use at a later trial. The Court then concluded that an objective four-year-old of average intelligence and under the existing circumstances would not consider that her statements might later be used against [Appellant]. In fact, when he talked to [A.A.] on her own front porch, Geist was wearing blue jeans and never indicated to her his suspicions, the nature of his job, or her potential role as a witness against [Appellant]. Dr. Ryen also wore casual clothing and no badge of authority; he did not apprise [A.A.] of the purpose of their visit; and offered no indication that her statements could later be used in court. He then proceeded to engage [A.A.] in conversation and play that no typical four-year-old would interpret as being designed to elicit inculpatory information.

Trial Court Opinion, 5/5/06, at 4 (record citations omitted). We note that the trial court did not have the benefit of the United States Supreme Court's decisions in *Davis* or *Bryant* at the time it authored its opinion.

The Superior Court did, however, have the benefit of *Davis*, and, in affirming the trial court's holding with respect to A.A.'s statements to Geist, opined that the language of *Davis*

implies that a number of factors must *all* be considered in determining whether a statement is testimonial; the use of the word "and" indicates that both prongs of the test must be satisfied before a statement can be considered testimonial. In satisfying the first half of the *Davis* test by determining whether the statement being examined was given during an ongoing emergency, only one factor needs to be examined—the temporal relation of the statement being examined to the wrong the statement describes.

Satisfying the primary purpose prong of the *Davis* test, in contrast, encompasses examination of two factors. The first factor that must be considered is the objective intent of the declarant and the objective intent of the questioner in giving and eliciting the statement being considered. Furthermore, the environment in which the statement was given, including the attendant formalities, must also be considered.... In sum, the Court's primary purpose test seems to be a variant of the totality of the circumstances test with parameters that are more specifically defined.

*Allshouse*, 924 A.2d at 1221 (citations omitted).

With regard to A.A.'s statement to Geist, the Superior Court then concluded:

Examining the facts and circumstances of this interview leads us to the conclusion that A.A.'s statements are admissible as non-testimonial under *Crawford*, should a hearsay exception prove applicable.[14] While we recognize Geist conducted the interview a full seven days after the assault, the intentions of Geist and A.A. as well as the attendant environmental factors indicate A.A.'s statements are, indeed, non-testimonial in nature.

Presently, appellant does not dispute Geist's contention that he only wanted to interview A.A. after appellant accused the young girl of harming J.A., and it would be absurd to assume A.A. had intended to give statements for use in a legal proceeding. Geist's failure to interview A.A. when he had her under his [exclusive supervision and control when he first transported A.A. and her siblings to their grandparents' home] also indicates Geist's contention is credible and, hence, there is little question Geist's primary purpose in interviewing A.A. was not to establish past events which would be potentially relevant in a criminal trial, but to ensure both A.A. and her siblings' welfare was

14. The Superior Court did not determine that a specific hearsay exception applied; rather, as noted in our discussion of the trial court's admission of A.A.'s statement to Geist under the amended version of the TYHA, *infra*, it concluded that the trial court could have admitted A.A.'s statements under *Roberts* based on a finding that they contained particularized guarantees of trustworthiness.

secure while they remained in the custody of her grandparents. In addition thereto, Geist did not report A.A.'s statements to law enforcement but, rather, notified his CYS supervisor of them after the interview, even though he had the option of reporting the incident to the police.

Furthermore, the environment surrounding the interview does not indicate A.A.'s statements were testimonial. As noted above, Geist was dressed casually and the interview was conducted on neutral ground. Additionally, Geist had no control over the interviewing environment-as his inquires were cut short after appellant's brother intervened. There was simply no semblance of formality during the interview.

In sum, we do not view the Supreme Court's primary purpose test as being reliant solely on the temporal relationship between the statement and the wrong the statement describes and, instead, view the test as encompassing the broader range of factors applied in *Davis*. Inasmuch as this is the case, we conclude Geist's testimony is nontestimonial. *Allshouse*, 924 A.2d at 1222–23 (footnotes and citations omitted).

█ Appellant, however, maintains that A.A.'s statements to both Geist and Dr. Ryen were testimonial under *Crawford*. As discussed above, in considering whether A.A.'s statements were testimonial, and thus subject to Confrontation Clause protection, we must determine the primary purpose of the interrogations during which the statements were made. In making this determination, we first consider whether the interrogation occurred during the existence, or perceived existence, of an ongoing emergency. With respect to Geist's interrogation of A.A., Appellant avers:

An objective view of these circumstances does not allow the conclusion to be drawn that there was some present emergency. There was no criminal activity going on. Geist's approach was simply to interview a witness to a possible assault. He testifies to no other reason and all his questions, but for one [namely, whether the witness harmed the child], are focused on that goal. There simply is no threatening situation to terminate.

Appellant's Supplemental Brief at 49 (footnote omitted). We are not persuaded by Appellant's argument.

■ Geist's interview with A.A. occurred on May 27, 2004, one week after the assault on J.A., and after J.A. had been removed from the family home; thus, according to Appellant, there was no longer an ongoing emergency. The validity of Appellant's argument, however, is premised on Appellant having caused J.A.'s injury. On May 27, 2004, Appellant told Geist that he believed A.A. had caused J.A.'s injury. N.T. Trial, 9/19/05, at 128. It was thus incumbent upon Geist to immediately investigate the matter further, because, at that time, A.A. and J.A. were together in their grandparents' home, where A.A. could do further harm to J.A. Indeed, Geist interviewed A.A. the same day that Appellant told Geist he believed A.A. caused J.A.'s injury. Under these circumstances, we find no error by the Superior Court in concluding A.A.'s statement to Geist was given in the context of an ongoing emergency.[1516]

■ As the Supreme Court's recent decision in *Bryant* makes clear, however, a finding that A.A.'s statement was

15. We recognize that *Davis* and *Bryant* contemplate that nontestimonial statements are those made in order "to enable police assistance to meet an ongoing emergency," and that Geist is not a police officer. However, the *Davis* Court construed *arguendo* the acts of 911 operators to be acts of the police on the basis that, even if 911 operators were not themselves law enforcement officers, they "may at least be agents of law enforcement when they conduct interrogations of 911 callers." 547 U.S. at 822, 823, n. 2, 126 S.Ct. 2266. Unfortunately, as the statements in *Bryant* were made to police officers, the high Court did not further address the question of "whether and when statements made to someone other than law enforcement personnel are 'testimonial.' " *Bryant*, 131 S.Ct. at 1155 n. 3. Nevertheless, for purposes of our analysis herein, we will construe Geist, who was contacted by hospital officials when J.A. was brought into the emergency room, and who was responsible for ensuring the safety of J.A. upon J.A.'s removal from the family home, as an agent of law enforcement.

16. Appellant also avers that the "absence of any active medical condition during this interaction between [A.A.] and [Geist] confirms a lack of emergency." Appellant's Supplemental Brief at 52. The *Bryant* Court explained that the medical condition of the victim is important to the primary purpose inquiry "to the extent that it sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would neces-

made during an ongoing emergency, though one of the most significant factors to be considered in a primary purpose inquiry, is not dispositive. *See Bryant,* 131 S.Ct. at 1160 ("whether an ongoing emergency exists is simply one factor—albeit an important factor—that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation"). We must also consider the statements and actions of both A.A. and Geist, as well as the formality of the circumstances surrounding the interview.

In the instant case, the Superior Court concluded that A.A.'s statement to Geist was nontestimonial under *Davis* because (a) Geist's intent during his interview with A.A. was not to obtain testimony for the purpose of a criminal proceeding, but to ensure the safety of J.A. and his siblings, and (b) the environment and circumstances surrounding A.A.'s statement were informal and not suggestive of an investigatory interview. *Allshouse,* 924 A.2d at 1223.

█ As discussed above, Geist interviewed A.A. only after Appellant suggested that A.A. was responsible for harming her younger brother, J.A., with whom she still resided. In arguing that Geist's primary purpose was to "solicit details about a past event," Appellant avers: "[Geist] asked [A.A.] if she harmed her brother. Upon hearing a negative response, Geist moved on and continued "to investigate and figure out what happened. The rest of his questions were geared to learning about who did it and how he did it." Appellant's Supplemental Brief at 54. However, Appellant's focus on the specific questions asked by Geist is inconsistent with the *Bryant* Court's reminder that "it is the statements, and not the questions, that must be evaluated under the Sixth Amendment." *Bryant,* 131 S.Ct. at 1161 n. 11.

sarily be a testimonial one." *Bryant,* 131 S.Ct. at 1159. However, the Court did not suggest that the victim's medical condition, or lack thereof, was determinative, or even that it was relevant in all cases. *See id.* ("*Davis* and *Hammon* did not present medical emergencies, despite some injuries to the victims. Thus, we have not previously considered, much less ruled out, the relevance of a victim's severe injuries to the primary purpose inquiry." (citations omitted)). We reject Appellant's contention that it is determinative herein.

Appellant further argues that Geist's actions after the interview, including relaying A.A.'s statement to his supervisor, suggest that Geist's primary purpose in conducting the interview was to establish past events for use in a subsequent criminal prosecution:

[Geist's] supervisor reported the matter to police. Geist then "typed up a bunch of notes" from his interviews and "gave them to the district attorney.'" Geist later met with a police officer and the district attorney, and participated in "[a] free-flow of information". The district attorney also gave Geist various "instructions" for conducting future interviews. He also arranged for Dr. Ryen to join the investigative team.

Appellant's Supplemental Brief at 54–55 (record citations omitted). With the exception of Geist relaying A.A.'s statement to his own supervisor, which, as the Superior Court noted, Geist was statutorily obliged to do,[17] these actions were either performed by someone other than Geist, i.e., his supervisor or the district attorney, or were performed by Geist *after* the matter had been referred to the police. Thus, we conclude the actions have no bearing on determining Geist's primary purpose in conducting his interview with A.A. in the first instance, and find that the statements and actions of Geist support the Superior Court's determination that the primary purpose of his interview with A.A. was to allow Geist to assess and address what he believed to be an ongoing emergency, not to obtain testimony about a past event for use in a criminal proceeding.[18]

We also must consider the statements and actions of A.A. during her interview with Geist to determine whether her

17. *See Allshouse*, 924 A.2d at 1223 n. 17 ("Geist followed the statutory procedure in notifying his CYS supervisor, which requires him to report suspected instances of child abuse to the Department of Public Welfare." (citing 23 Pa.C.S.A. § 6311, Persons required to report child abuse, and 23 Pa.C.S.A. § 6313, Reporting Procedure)).

18. The Pennsylvania Association of Criminal Defense Lawyers, the Defender Association of Philadelphia, and the Public Defender Association of Pennsylvania (collectively, "Amici") have filed a joint amicus brief on behalf of Appellant. In addition to echoing Appellant's argu-

primary purpose in making the statements was to establish past events for use during a subsequent criminal prosecution. *See Bryant,* 131 S.Ct. at 1160 (the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation). The trial court opined that it was unlikely that A.A., who was only four years old at the time of the interview, would have contemplated that her statements might later be used against Appellant in a criminal prosecution. The trial court further noted that Geist never conveyed to A.A. the nature of his job, any suspicions he may have had, or the possibility that A.A. would have to be a witness against Appellant. Trial Court Opinion, 5/5/06, at 4.

Nevertheless, in support of his argument that the "words and actions of [A.A.] also demonstrate the primary purpose [of her interview with Geist] was to relay her knowledge about past events," Appellant's Supplemental Brief at 55, Appellant suggests that the mere fact that A.A. agreed to speak with Geist and answered his questions is indicative of her intent to "report facts about possible criminal conduct that occurred a week earlier." *Id.*[19] We do not agree with Appel-

ment that, in the context of determining the primary purpose of statements, statements of children should be analyzed in the same manner as statements made by adults, which we discuss *infra,* Amici argue that in applying the "primary purpose" test, as set forth in *Davis* and *Bryant,* a court should consider whether there were "multiple primary purposes," and if one of those purposes was to obtain information for use in a criminal investigation, the resulting statement should be deemed testimonial. Supplemental Amicus Brief at 9–10. Amici further contend that a review of "national and Pennsylvania protocols makes clear that interviews of children by social workers and physicians ... are core testimonial statements," taken as part of a police investigation designed "to obtain information for use in later prosecution." *Id.* at 14–15 (emphasis omitted). Appellant did not raise these arguments before the lower courts, and has not raised them in either this original or his supplemental brief to this Court. Amicus cannot raise issues in an appeal which have not been preserved or raised by the parties themselves. *See Alliance Home of Carlisle, Pa. v. Board of Assessment Appeals,* 591 Pa. 436, 465 n. 8, 919 A.2d 206, 221 n. 8 (2007). Accordingly, we do not address these arguments further.

19. Appellant argued in his original brief that the Superior Court erred in its application of the primary purpose test by considering the

lant's suggestion that A.A.'s mere acquiescence in speaking with Geist, without more, is evidence that the purpose of Geist's interview with A.A. was to have A.A. provide testimony regarding past events for use in a subsequent criminal proceeding, and Appellant provides no support for such a conclusion.

Appellant further argues the trial court erred in considering A.A.'s age in evaluating the primary purpose of her interview with Geist. Appellant avers "nothing in [*Crawford's*] framework turns on the age of the witness," and "[a] child's statements in an interview with a CYS investigator operate as a substitute for live testimony just as readily as an adult's statements in the same context would." *Id.* at 56–57. Initially, we note that neither of the lower courts held that A.A.'s statements were nontestimonial solely because of age. Rather, the trial court simply considered A.A.'s age as one factor in evaluating her statements and actions as part of its primary purpose determination.

Nevertheless, Appellant contends that any consideration of A.A.'s age was improper, citing *State v. Siler*, 116 Ohio St.3d 39, 876 N.E.2d 534 (2007), for the proposition that the age of the declarant (who in *Siler* was three years old), "is not relevant to a confrontation clause analysis." Appellant's Supplemental Reply Brief, at 4–5. However, the court in *Siler* did not hold that the declarant's age was not *relevant*; rather, it held that the declarant's age was not *determinative*, and that a child's statement should be evaluated under the primary purpose test. *Siler*, 876 N.E.2d at 544.

 Moreover, we agree with the position taken by the Colorado Supreme Court in *People v. Vigil:*

An assessment of whether or not a reasonable person in the position of the declarant would believe a statement would be available for use at a later trial involves an analysis of the expectations of a reasonable person in the position of the

declarant's intent in making her statements. Appellant now concedes that, pursuant to *Bryant*, the declarant's intent is, in fact, relevant. *See* Appellant's Supplemental Brief at 53.

declarant. Expectations derive from circumstances, and, among other circumstances, a person's age is a pertinent characteristic for analysis.

127 P.3d 916, 925 (Colo.2006) (citing, *inter alia, Lagunas v. State,* 187 S.W.3d 503 (Tex.App.2005) (considering a declarant's age as a circumstance relevant to the inquiry of whether the child's statement constituted testimonial evidence)). Indeed, we conclude this approach is consistent with *Bryant*'s requirement that a court consider *all of the relevant circumstances* when determining whether a declarant's statements are testimonial. *Id.* at 1162. Accordingly, we reject Appellant's contention that the statements and actions of A.A. suggest that the primary purpose of her interview with Geist was to have A.A. recount past events for later use in a criminal proceeding.

■ Finally, pursuant to *Bryant,* we consider the circumstances which surrounded Geist's interview with A.A. In *Bryant,* the Court considered the circumstances surrounding the interview of the victim, and concluded, based on, *inter alia,* the "fluidity" of the situation, that the "informality of the situation and interrogation" was more similar to the 911 call in *Davis* than the station-house interview conducted in *Crawford. Bryant,* 131 S.Ct. at 1166. The *Bryant* Court opined that such informality suggested "the interrogators' primary purpose was simply to address what they perceived to be an ongoing emergency, and the circumstances lacked any formality that would have alerted [the victim] to ... the possible future prosecutorial use of his statements." *Id.*

Despite Appellant's assertion that, *inter alia,* Geist's act of introducing himself to A.A. and shaking her hand, along with the location of the interview created a sense of formality, Appellant's Supplemental Brief at 58–59, we find the circumstances surrounding Geist's interview with A.A. lacked formality. Geist was dressed in jeans; Geist and A.A. sat on the front porch of her grandmother's house;[20] and Geist had no

20. Appellant avers that a "greater sense of formality attended this CYS interview" than that surrounding Amy Hammon's statement to police in the consolidated appeals of *Hammon v. Indiana,* and *Davis v. Washing-*

control over the environment, as his conversation with A.A. was cut short when Appellant's brother intervened.

For all of the foregoing reasons, under *Crawford* and its progeny, we hold that A.A.'s statement to Geist was nontestimonial, and its admission at trial did not violate Appellant's rights under the Confrontation Clause.

We now turn our attention to whether A.A.'s statement to Dr. Ryen was testimonial. We would have difficulty concluding that A.A.'s statement to Dr. Ryen was given during an ongoing emergency, as Dr. Ryen's interview with A.A. took place on June 8, 2004, nearly two weeks after Appellant suggested to Geist that A.A. may have been responsible for J.A.'s injuries. Nevertheless, we need not consider whether A.A.'s statement was testimonial under *Crawford* and its progeny. As the Superior Court opined, any error in admitting A.A.'s statement to Dr. Ryen was harmless because the statement was merely cumulative of A.A.'s statement to Geist, which we have concluded was properly admitted.

ton, in *Davis.* Therein, police responded to a report of a domestic disturbance at the Hammon home. When they first arrived, police found Mrs. Hammon alone on the front porch. Despite appearing "somewhat frightened," Mrs. Hammon told police that nothing was wrong, but gave them permission to enter the house. Upon entering the house, police observed broken glass on the floor, and Mr. Hammon indicated that he and his wife had been in an argument. When Mrs. Hammon came back inside, one of the officers stayed with Mr. Hammon in the kitchen, and another officer went into the living room with Mrs. Hammon and again asked her what had happened. Appellant contends that the circumstances surrounding Geist's interview with A.A. were more formal than those in *Hammon* because, *inter alia,* A.A. had not been in Appellant's custody for a week, and A.A. and Appellant "were geographically separated by a distance greater than the room next door." Appellant's Supplemental Brief at 58. We do not agree. As discussed above, Geist interviewed A.A. on the same day that Appellant suggested she was responsible for harming J.A. Moreover, in the *Hammon* appeal in *Davis,* the police officer "insisted that [the husband] stay separated from Mrs. Hammon so that [the police could] investigate what had happened." *Davis,* 547 U.S. at 820, 126 S.Ct. 2266. Here, Geist spoke with A.A. on the front porch of the home where she had been staying, with the permission of her grandparents, and the conversation ended when one of Appellant's brothers came outside and A.A. stopped talking. N.T. Hearing, 9/16/05, at 10–11.

 It is well settled that "an appellate court has the ability to affirm a valid judgment or verdict for any reason appearing as of record." *Commonwealth v. Parker,* 591 Pa. 526, 534–35, 919 A.2d 943, 948 (2007) (citing *Commonwealth v. Katze,* 540 Pa. 416, 658 A.2d 345 (1995) (Opinion in Support of Affirmance)). As we explained in *Commonwealth v. Thornton,*

> [t]he doctrine of harmless error is a technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial error was harmless beyond a reasonable doubt. Its purpose is premised on the well-settled proposition that "[a] defendant is entitled to a fair trial but not a perfect one."

494 Pa. 260, 266, 431 A.2d 248, 251 (1981). This Court may affirm a judgment based on harmless error even if such an argument is not raised by the parties.[21]

---

**21.** Appellant argues that the Superior Court improperly engaged in a harmless error analysis with regard to the admissibility of A.A.'s statement to Dr. Ryen because the Commonwealth failed to provide sufficient argument in support of a finding thereof. Specifically, Appellant avers that the Commonwealth's only mention of the concept of harmless error was contained in a two-sentence footnote in its brief to the Superior Court, Appellant's Brief at 74, and that the Commonwealth argued that any error in the admission of A.A.'s statement to Geist would be harmless error if A.A.'s statement to Dr. Ryen was deemed properly admitted because the statement given to Dr. Ryen was more detailed, and Geist's testimony would be cumulative of Dr. Ryen's testimony.

First, the discrepancy as to which statement was alleged to be cumulative of another is immaterial to the issue of whether the Superior Court improperly engaged in a harmless error analysis in the first instance. Furthermore, in *Commonwealth v. Katze,* 540 Pa. 416, 658 A.2d 345 (1995) (Opinion in Support of Affirmance), three Justices agreed that the Commonwealth did not waive its right to argue harmless error before the Superior Court by failing to first raise the issue before the trial court on the defendant's motion for a new trial:

> There is a general rule that issues not raised in the lower court may not be addressed on appeal; however, this rule is applicable only to appellants. The Commonwealth in the instant matter was not the appellant before the trial court, where the waiver is alleged to have occurred; therefore, it could not have waived any issues. Appellant cites several cases in support of its proposition that the Commonwealth waived its right to argue harmless error; however, in all of the cases cited, the party deemed to have waived an issue was the

We agree with the Superior Court that any error in the admission of A.A.'s statement to Dr. Ryen was harmless error because the statement was merely cumulative of the statement A.A. made to Geist. Indeed, the substance of A.A.'s statements to Dr. Ryen and Geist was the same: A.A. indicated to both Geist and Dr. Ryen that Appellant had hurt J.A. by grabbing and pulling on J.A.'s arm. Accordingly, Appellant is not entitled to relief based on his claim that A.A.'s statement to Dr. Ryen was improperly admitted.

 Having determined that A.A.'s statement to Geist was not testimonial under *Crawford* and its progeny, and thus not subject to the protections of the Confrontation Clause, we now address Appellant's argument that the trial court's admission of the statement as a hearsay exception under the current version of the TYHA constituted an *ex post facto* violation.[22] The trial court found A.A.'s statements to Geist and Dr. Ryen admissible under the tender years hearsay exception. The current version of the TYHA, which became effective on July 15, 2004, provides:

> (a) General rule.—An out-of-court statement made by a child victim or witness, who at the time the statement was made was 12 years of age or younger, describing any of the offenses enumerated in 18 Pa.C.S. Chs. 25 (relating to criminal homicide), 27 (relating to assault), 29 (relating to

appellant. The Commonwealth, as the non-moving party before the trial court in the instant matter, had no obligation to preserve issues at the post-trial stage in the appeal process. Therefore, it was permitted to raise the issue of harmless error before the Superior Court.

540 Pa. at 425, 658 A.2d at 349 (footnote and citation omitted). In the case *sub judice*, the Commonwealth was not the moving party before the trial court or the Superior Court, and, therefore, had no obligation to preserve any claim of harmless error. Moreover, it was within the Superior Court's discretion to affirm the judgment against Appellant for any reason. Accordingly, we reject Appellant's argument that the Superior Court erred in engaging in a harmless error analysis.

22. Appellant makes the same argument with respect to A.A.'s statement to Dr. Ryen, but as we have concluded that any error in admitting A.A.'s statement to Dr. Ryen was harmless, we need only address his claim concerning Geist. Regardless, the analysis *infra* applies to both statements.

kidnapping), 31 (relating to sexual offense), 35 (relating to burglary and other criminal intrusion) and 37 (relating to robbery), not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal or civil proceeding if:

(1) the court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(2) the child either:

(i) testifies at the proceeding; or

(ii) is unavailable as a witness.

42 Pa.C.S.A. § 5985.1(a) (amended 2004).

At the time J.A. was injured in May 2004, however, the prior version of the TYHA was still in effect, and provided:

(a) General rule.—An out-of-court statement made by a child victim or witness, who at the time the statement was made was 12 years of age or younger, describing physical abuse, indecent contact or any of the offenses enumerated in 18 Pa.C.S. Ch. 31 (relating to sexual offenses) *performed with or on the child by another,* not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal proceeding if:

(1) the court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability; and

(2) the child either:

(i) testifies at the proceeding; or

(ii) is unavailable as a witness.

42 Pa.C.S.A. § 5985.1(a) (2000) (emphasis added). Thus, the amended version eliminated the requirement that the offense be "performed with or on the child." Appellant contends that the trial court's admission at trial, under the amended version of the TYHA, of A.A.'s statements to Geist and Dr. Ryen, that did not describe abuse performed *with or on A.A.,* constituted

a violation of the prohibition against *ex post facto* laws contained in the United States and Pennsylvania Constitutions.[23]

Preliminarily, we note that the *ex post facto* clauses of the United States and Pennsylvania Constitutions are virtually identical in language, and the standards applied to determine *ex post facto* violations under both constitutions are comparable. *Commonwealth v. Young*, 536 Pa. 57, 65 n. 7, 637 A.2d 1313, 1317 n. 7 (1993) (holding that analysis of the appellant's federal *ex post facto* claim disposed of his state claim as well). The *ex post facto* clause of the United States Constitution provides: "No State shall ... pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts...." U.S. Const. art. 1, § 10. The *ex post facto* clause of the Pennsylvania Constitution provides: "No ex post facto law, nor any law impairing the obligation of contracts, or making irrevocable any grant of special privileges or immunities, shall be passed." Pa. Const. art. 1, § 17.

A law violates the *ex post facto* clause of the United States Constitution if it (1) makes an action done before the passing of the law, and which was innocent when done, criminal, and punishes such action; (2) aggravates a crime, or makes it greater than it was when committed; (3) changes the punishment, and inflicts a greater punishment than the law annexed to the crime when committed; or (4) alters the legal

**23.** Appellant, who was not charged with any sexual offenses, apparently interprets the phrase "performed with or on the child by another," as contained in the prior version of the TYHA, as modifying all the crimes listed. *See* Appellant's Brief at 63 ("The evidence, however, does not show any act by Allshouse which was 'performed with' or 'on the child' witness."). In the prior version of the TYHA, however, the phrase "performed with or on the child by another" arguably could be read to apply **only** to sexual offenses; under such a reading, the portion of the TYHA relevant to the instant case would have been the same under both versions of the TYHA, since both versions would have permitted out-of-court statements made by a child witness, age 12 or younger, describing physical abuse. In that (1) the Commonwealth does not challenge Appellant's argument in this regard; (2) the prior version of the TYHA is no longer in effect; and (3) we conclude, for the reasons discussed *infra*, that application of the amended version of the TYHA does not violate the prohibition against *ex post facto* laws regardless, it is unnecessary for us to engage in a statutory construction analysis to determine whether Appellant's interpretation is correct.

rules of evidence, and receives less, or different, testimony than the law required at the time of the commission of the offense in order to convict the offender. *Carmell v. Texas*, 529 U.S. 513, 522, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000) (citing *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798)); *Young*, 536 Pa. at 65–66, 637 A.2d at 1317 (assertion of an *ex post facto* violation based on the third prong of *Calder*).

Appellant maintains that the trial court's application of the amended version of the TYHA in his case violated the fourth *Calder* prong because "[t]he evidence received at trial was *different* than what would have been received back in May, 2004." Appellant's Brief at 71 (emphasis original). In denying Appellant relief on his *ex post facto* claim, the Superior Court reasoned:

> The trial court, by applying the [TYHA] to the current controversy, was required to find A.A. was unavailable and was also required to find indicia of reliability. 42 Pa.C.S.A. § 5985.1. The record demonstrates the indicia of reliability ultimately found by the trial court was not the Tender Years Hearsay Act itself, in accordance with the aspect of the *Roberts* definition that allows reliability to be found in a "firmly rooted hearsay exception."

> [Rather], the trial court's finding of reliability, which was not in the form of a "firmly rooted hearsay exception" and was premised on a finding of "particularized guarantees of trustworthiness," satisfies *Roberts*, which was binding precedent when appellant was charged and remains binding precedent in analyzing the admission of non-testimonial hearsay today. Thus, even if we assume arguendo the trial court's application of the Act constitutes an *ex post facto* violation, this application is inconsequential, as the trial court simply could have applied *Roberts* and reached the identical result. There is no reason to reverse and remand, as the trial court could simply reach the same result by stating that it is applying *Roberts*.

*Allshouse*, 924 A.2d at 1226–27 (footnote omitted). We conclude Appellant is not entitled to relief on the basis of his *ex*

*post facto* claim, albeit for different reasons than relied upon by the Superior Court.[24]

The United States Supreme Court addressed the issue of *ex post facto* laws regarding rules of evidence in *Hopt v. Utah,* 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884). In *Hopt,* the appellant committed a murder at a time when the law precluded a particular class of witnesses—namely, convicted felons—from testifying at trial. By the time of the appellant's trial, however, this law had been repealed, and the trial court allowed a witness who was incarcerated on murder charges to testify at the appellant's trial. In holding there was no violation of the prohibition against *ex post facto* laws, the Court stated:

Statutes which simply enlarge the class of persons who may be competent to testify in criminal cases are not *ex post facto* in their application to prosecutions for crimes committed prior to their passage; for they do not attach criminality to any act previously done, and which was innocent when done, nor aggravate any crime theretofore committed, nor provide a greater punishment therefore than was prescribed at the time of its commission, nor do they alter the degree, or lessen the amount or measure, of the proof which was made necessary to conviction when the crime was committed. The crime for which the present defendant was indicted, the punishment prescribed therefore, and the quantity or the degree of proof necessary to establish his guilt, all remained unaffected by the subsequent statute. Any statutory alteration of the legal rules of evidence which would

24. The Superior Court, in concluding that A.A.'s statements were admissible as nontestimonial hearsay under *Roberts* based on the trial court's finding that the testimony contained particularized guarantees of trustworthiness, did not recognize that, even if A.A.'s statements were admissible on this basis under federal constitutional law, the statements might nonetheless be inadmissible under Pennsylvania's rules of evidence, which rules prohibit the admission of hearsay "except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.E. 802. As a result of our conclusion that the trial court's application of the amended TYHA did not violate the *ex post facto* clause of either the United States or Pennsylvania Constitution, however, we need not address this matter further.

authorize conviction upon less proof, in amount or degree, than was required when the offense was committed, might, in respect of that offense, be obnoxious to the constitutional inhibition upon *ex post facto* laws. But alterations which do not increase the punishment, nor change the ingredients of the offense or the ultimate facts necessary to establish guilt, but-leaving untouched the nature of the crime and the amount or degree of proof essential to conviction-only removes existing restrictions upon the competency of certain classes of persons as witnesses, relate to modes of procedure only, in which no one can be said to have a vested right, and which the state, upon grounds of public policy, may regulate at pleasure. Such regulations of the mode in which the facts constituting guilt may be placed before the jury can be made applicable to prosecutions or trials thereafter had, without reference to the date of the commission of the offense charged.

*Hopt,* 110 U.S. at 589–90, 4 S.Ct. 202.

Similarly, in *Thompson v. Missouri,* 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898), the appellant alleged an *ex post facto* violation when evidence consisting of a handwriting comparison, which was inadmissible at the time the crime was committed and at the appellant's first trial, was used in a second trial at which the appellant ultimately was convicted. The Supreme Court rejected the appellant's argument using language similar to that used in *Hopt:*

[W]e adjudge that the statute of Missouri relating to the comparison of writings is not *ex post facto* when applied to prosecutions for crimes committed prior to its passage. If persons excluded upon grounds of public policy at the time of the commission of the offense, from testifying as witnesses for or against the accused, may, in virtue of a statute, become competent to testify, we cannot perceive any ground upon which to hold a statute to be *ex post facto* which does nothing more than admit evidence of a particular kind in a criminal case upon an issue of fact which was not admissible under the rules of evidence as enforced by judicial decisions at the time the offense was committed. The Missouri

statute, when applied to this case, did not enlarge the punishment to which the accused was liable when his crime was committed, nor make any act involved in his offense criminal that was not criminal at the time he committed the murder of which he was found guilty. It did not change the quality or degree of his offense. Nor can the new rule introduced by [it] be characterized as unreasonable; certainly not so unreasonable as materially to affect the substantial rights of one put on trial for crime. The statute did not require "less proof, in amount or degree," than was required at the time of the commission of the crime charged upon him. It left unimpaired the right of the jury to determine the sufficiency or effect of the evidence declared to be admissible, and did not disturb the fundamental rule that the state, as a condition of its right to take the life of an accused, must overcome the presumption of his innocence, and establish his guilt beyond a reasonable doubt.... The statute did nothing more than remove an obstacle arising out of a rule of evidence that withdrew from the consideration of the jury testimony which, in the opinion of the legislature, tended to elucidate the ultimate, essential fact to be established, namely, the guilt of the accused.... We cannot adjudge that the accused had any vested right in the rule of evidence which obtained prior to the passage of the Missouri statute, nor that the rule established by that statute entrenched upon any of the essential rights belonging to one put on trial for a public offense.

*Thompson,* 171 U.S. at 386–88, 18 S.Ct. 922.

Most recently, in *Carmell, supra,* the Supreme Court considered an *ex post facto* challenge to a Texas law, an amendment to which altered the rules of evidence for crimes committed prior to the amendment. The appellant in *Carmell* was convicted in 1996 on 15 counts of committing sexual offenses against his stepdaughter. The offenses were committed between 1991 and 1995, when the victim was between 12 and 16 years old. Prior to September 1, 1993, Art. 38.07 of the Texas Code of Criminal Procedure specified that a victim's testimony regarding a sexual offense could not support a conviction

unless (1) corroborated by other evidence or (2) the victim informed another person of the offense within six months of its occurrence (an "outcry"). However, if the victim was under age 14 at the time of the offense, the victim's testimony alone could support a conviction. The original version of Article 38.07 read:

A conviction under Chapter 21, Section 22.011, or Section 22.021, Penal Code, is supportable on the uncorroborated testimony of the victim of the sexual offense if the victim informed any person, other than the defendant, of the alleged offense within six months after the date on which the offense is alleged to have occurred. The requirement that the victim inform another person of an alleged offense does not apply if the victim was younger than 14 years of age at the time of the alleged offense.

*Carmell,* 529 U.S. at 517, 120 S.Ct. 1620, quoting Tex.Code Crim. Proc. Ann., Art. 38.07 (1983). Subsequently, a 1993 amendment to the code of criminal procedure allowed a conviction based on the victim's testimony alone if the victim was under age 18.

Carmell appealed his convictions on four of the counts, arguing that the convictions could not stand under the pre–1993 version of the law in effect at the time the crimes were committed because the convictions were based solely on the testimony of the victim, who was not under 14 at the time of the offenses and had not made a timely outcry. The Texas Court of Appeals, citing *Hopt, supra,* held that applying the 1993 amendment retroactively did not violate the *ex post facto* clause of the United States Constitution because it did not increase the punishment or change the elements of the offense the state had to prove; rather, it merely removed certain restrictions on the competency of certain classes of persons as witnesses, and, thus, was simply a rule of procedure. *Carmell,* 529 U.S. at 520, 120 S.Ct. 1620. Recognizing a conflict in decisions regarding the retroactive application of a statute repealing a corroboration requirement, the United States Supreme Court granted review, and, in a 5–4 decision, reversed the Texas Court of Appeals.

The Court first emphasized that "Texas courts treat Article 38.07 as a sufficiency of the evidence rule, rather than as a rule concerning the competency or admissibility of evidence." *Id.* at 518 n. 2, 120 S.Ct. 1620. After acknowledging the four categories of *ex post facto* laws set forth in *Calder* and discussed above, the Court noted that a law that alters the legal rules of evidence, and allows for the receipt of less, or different testimony than the law required at the time of the commission of the offense in order to convict the offender, constitutes the fourth type of *ex post facto* law set forth in *Calder*. With respect to the merits of the case before it, the Court concluded:

Article 38.07 is unquestionably a law "that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." Under the law in effect at the time the acts were committed, the prosecution's case was legally insufficient and petitioner was entitled to a judgment of acquittal, unless the State could produce both the victim's testimony and corroborative evidence. The amended law, however, changed the quantum of evidence necessary to sustain a conviction; under the new law, petitioner could be (and was) convicted on the victim's testimony alone, without any corroborating evidence. Under any commonsense understanding of *Calder's* fourth category, Article 38.07 plainly fits. Requiring only the victim's testimony to convict, rather than the victim's testimony plus other corroborating evidence is surely "less testimony required to convict" in any straightforward sense of those words.

*Carmell*, 529 U.S. at 530, 120 S.Ct. 1620 (emphasis omitted).

After careful review, we find *Carmell* distinguishable, and we conclude that the amended version of the TYHA at issue in the instant case is more akin to the laws challenged in *Hopt* and *Thompson*. Accordingly, we hold, as did the Supreme Court in those cases, that application of the amended version of the TYHA does not constitute a violation of the United States or Pennsylvania *ex post facto* clauses. The TYHA is

not a sufficiency rule, as it does not address the type of evidence sufficient to support a conviction. Unlike the amendment to Art. 38.07 of the Texas Code of Criminal Procedure challenged in *Carmell*, which altered the specific requirement that the State produce evidence of both the victim's testimony and corroboration *in order to convict* a defendant, the amended version of the TYHA in the instant case did not alter the evidence the Commonwealth was required to prove in order to convict Appellant. A.A.'s testimony, though potentially helpful, was not an essential element of the Commonwealth's case against Appellant. Indeed, evidence consisting of the testimony of Mother and the emergency room physician, though circumstantial, arguably was sufficient to support Appellant's conviction. The amended version of the TYHA simply *expanded* the class of persons whose out-of-court statements are admissible in court, from a victim or witness, age 12 or younger, on or with whom an offense was performed by another, to a victim or witness, age 12 or younger. In eliminating the requirement that the offense had to be performed "with or on the child by another," the amended version of the TYHA "simply enlarge[d] the class of persons who may be competent to testify in criminal cases." *Hopt*, 110 U.S. at 589, 4 S.Ct. 202. Unlike in *Carmell*, the amendment did not allow Appellant to be convicted on less, or different evidence.[25]

**25.** *See, e.g., Commonwealth v. McElhenny*, 329 Pa.Super. 240, 478 A.2d 447 (1984), wherein the Pennsylvania Superior Court relied on both *Hopt* and *Thompson* to reject the appellant's challenge to the sentence imposed after he was convicted of third-degree murder. Appellant argued that the admission of certain evidence at trial, namely, a tape recording of a 911 telephone call made by the appellant in which he made incriminating statements, violated the *ex post facto* clause of the United States and Pennsylvania Constitutions. Under the law at the time the call was recorded, the recording, although legally made, could not be used as evidence in court, absent the appellant's written consent. By the time of trial, however, that law had been repealed, and a new law, under which the recording was admissible irrespective of the appellant's consent, was in effect.

In rejecting the appellant's *ex post facto* claim, the Superior Court acknowledged that the law in question altered the legal rules of evidence to allow the admission of different evidence, but emphasized that the law

did not alter the evidence necessary to *convict* the offender. That is, it did not change the legal definition of the crime; it did not change

Thus, we reject Appellant's argument that the trial court's admission at trial of A.A.'s statement to Geist violated the prohibition against *ex post facto* laws.

For all of the reasons set forth above, we affirm the order of the Superior Court.

Justices McCAFFERY and ORIE MELVIN did not participate in the consideration or decision of this case.

Chief Justice CASTILLE and Justices SAYLOR, EAKIN and BAER join the opinion.

Justice SAYLOR files a concurring opinion in which Chief Justice CASTILLE joins.

Justice SAYLOR, concurring.

I join the majority opinion, as I did the prior one in this case, while again crediting the majority author for doing the best job possible in light of the "many open questions in the wake of the immense shift in Confrontation Clause jurisprudence heralded by *Crawford* [,] leav[ing] lower-tier federal courts and state courts in a difficult position in terms of predicting the appropriate limits of this critical Sixth Amendment provision, as newly construed." *Commonwealth v. Allshouse*, 604 Pa. 61, 93, 985 A.2d 847, 866 (2009) (Saylor, J., concurring, joined by Castille, C.J.). To this, I would add that *Bryant* appears to work a new "immense shift" in the jurisprudence, as amply developed in the dissenting opinion by *Crawford*'s author, Justice Scalia. *See Michigan v. Bryant,* —— U.S. ——, 131 S.Ct. 1143, 1168–76, 179 L.Ed.2d 93 (2011) (Scalia, J., dissenting).

I would also highlight that, under the evolving primary purpose test, a finding of an ongoing emergency is not an essential predicate to a determination that a statement is non-testimonial. *See* Majority Opinion, at 245–246, 36 A.3d at 173 (quoting *Bryant,* —— U.S. at ——, 131 S.Ct. at 1155 ("[T]here

> the prohibited behavior or what the state had to show to prove the commission of the crime. That must be the focus of our enquiry and it did not occur here.
> *Id.* at 449 (internal citation omitted, emphasis original).

may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony.")). Accordingly, it is significant to me that, under the governing statutory scheme, investigative efforts undertaken by county agencies responsible for child protection services are:

> *for the purpose of* providing protective services to prevent further abuses to children and to provide or arrange for and monitor the provision of those services necessary to safeguard and ensure the well-being and development of the child and to preserve and stabilize family life wherever appropriate.

23 Pa.C.S. § 6362 (emphasis added).

Given the county agency's additional duty to coordinate investigations with law enforcement officials,[1] it would seem to me that child protection services investigations present classically mixed motive scenarios. Nevertheless, the circumstances before the *Bryant* Court are as readily viewed as involving deeply mixed motives; yet, against a staunch dissent amply developing such other motivations, the *Bryant* majority was able to accept the "ongoing emergency" overlay as predominant. *See Bryant,* —— U.S. at ——, 131 S.Ct. at 1165–67.

As such, my best prediction of the High Court's response to Pennsylvania child protection services investigations by county agencies, in terms of the new Confrontation Clause regime, is that it will afford substantial weight to the legislative design defining the agencies' purposes in terms of the provision of the essential services. *See* 23 Pa.C.S. § 6362. Thus, in circumstances in which agency personnel are acting in conformity with their authority and mandates (and there are no circumstances suggesting some hidden motive on the part of the involved child or children), it would seem to me that responsive statements generally should be deemed non-testimonial,

1. *See* 23 Pa.C.S. § 6353.1(b)(2). *See generally* 23 Pa.C.S. § 6302 (reflecting the design of the Child Protective Services Law as encompassing "involv[ing] law enforcement agencies in responding to child abuse").

and thus, as outside the concern of the Sixth Amendment's Confrontation Clause.[2]

Again, my reasoning in this regard is pursuant to the newest construction of the United States Constitution as reflected in the *Bryant* decision, which we have been asked to apply here.

Chief Justice CASTILLE joins this concurring opinion.

**2.** The above reasoning also reflects my best effort to reconcile *Crawford*'s vision of a "categorical constitutional guarantee[ ]" and eschewal of open-ended balancing tests and manipulable vague standards, *see Crawford*, 541 U.S. at 67–68, 124 S.Ct. at 1373, with *Bryant*'s multidimensional and apparently open-ended treatment of the primary purposes criterion. *See Bryant*, —— U.S. at ——, 131 S.Ct. at 1162. My difficulty, in this regard, is that I agree with Justice Scalia that such perspectives are, in fact, irreconcilable. *See id.* at ——, 131 S.Ct. at 1175–76 (Scalia, J., dissenting).