# Commonwealth v. Wilcox

*Melissa Kalaus*, for Commonwealth.
*Michael Rudinski*, for defendant.

LOVECCHIO, *J.*, March 27, 2014—Defendant is charged with numerous offenses relating to his alleged sexual assault of a six year old female. The information filed on July 12, 2012 charges him with Statutory Sexual Assault, Aggravated Indecent Assault, Involuntary Deviate Sexual Intercourse with a Child, Indecent Assault, Corruption of Minors, Rape of a Child, Indecent Exposure and Unlawful Contact with a Minor.

On October 15, 2013, the Commonwealth filed a motion to admit hearsay statements of the alleged victim. On August 22, 2013, the Commonwealth filed an amended motion to admit hearsay statements of the minor victim.

Hearings on the Commonwealth's motion were held before the court on November 12, 2013 and March 20, 2014.

The Commonwealth seeks to admit hearsay statements that the minor child victim made to four separate

individuals. These individuals include Melissa Dangle, Sherry Moroz, Lou Ann Ziegler and Kyle Mowrey.

Melissa Dangle testified at the November 12, 2013 hearing. She has been employed by Lycoming County Children and Youth for approximately 10 years.

A call was made to the agency in late February of 2012 regarding suspected abuse. Ms. Dangle traveled to the minor victim's school and met with the minor victim on February 27, 2012. This meeting was very brief. It lasted for approximately one-half hour. The child was emotional and spoke very little about what allegedly occurred.

They met again the next day at the agency's office. The minor victim was initially hesitant to talk about any alleged incident. As the meeting progressed, however, the child opened up. She talked about a "secret" that she was not allowed to talk about. She noted that her mother would be very mad. She disclosed that the secret was about "Chad." She went on to describe two separate incidents in which she did not have any clothes on and "Chad" only had his shirt on. In response to a question about whether the secret involved body parts, she pointed to her mouth.

Ms. Dangle explained that the purpose of the meeting was to determine if the child was safe in her present environment. Based upon what the child told her, she decided that the environment was not safe.

In discussing the interview, she noted that the child's statement was consistent in several particulars, that she could not "see" any motive to fabricate, that the child was not asked leading questions, that the answers the

child supplied were voluntary and that no promises or inducements were made to the child in exchange for answers. She further had no concern about the child "not being truthful."

Sherry Moroz also testified at the November 12, 2013 hearing. She is employed as a forensic interviewer with the Child Advocacy Center in Lewisburg. She met with the child on March 15, 2012 and conducted a forensic interview in which the child made numerous incriminating statements against defendant and described alleged sexual abuse. The child indicated that she thought it only happened two times and she was six years old when it happened.

One time the child was sleeping in her bed, and Chad came in and woke her up. It was nighttime and her mother was sleeping. He told her a "top secret." He told her to take off her clothes and he took off his pants, then they did the "secret." She was in the middle of the bed and he was doing the "secret" with her. The mouth, lady parts and man parts were involved. Chad touched hers and she touched his. His mouth touched her lady parts, and it didn't feel comfortable. She was lying down and Chad was sitting in the middle of the bed. She counted to 60 in her head. She also said she had to put hers on his. It felt kind of weird. Chad was lying down and she was in the middle of the bed. He told her it was "top secret." He also told her "how to do it." Chad told her he was finished and he said, "Now go back to bed." She also indicated that the man part got bigger, but nothing came out of it.

The second time, Chad told her to come into his room,

the master bedroom. This room had a blue floor and a giant bed. Her mom was sleeping downstairs on the couch. They did the same thing as the last time. She had her clothes off; Chad had his pants off. He only had a tank top on. He didn't even have his underwear on. Chad's mouth touched her lady parts. It was only on top of her lady parts, and it felt weird. There was never anybody else that touched her like that.

The interview was videotaped and also simultaneously observed by Ms. Dangle and the affiant, Sergeant Taylor of the South Williamsport Police Department. The interview was also observed by other members of the Advocacy Center's multi-disciplinary team. Following a portion of the interview, Ms. Moroz left the interview room and discussed with the "team" what issues, if any, needed to be further clarified or discussed.

Ms. Moroz indicated that the purpose of the interview was to determine if something happened to the child and if so, what specifically happened. She conceded that the purpose was to establish or prove past events potentially relevant to later proceedings.

While it was important to know what happened in connection with further treatment and safety planning, the purpose of the interview was not to address an immediate situation. It was "more like a step taken in an investigation after the action is over for purposes of aiding the investigation and potential prosecution." The purpose of the video was to make sure that the child's statement would be available at any "later proceedings."

Lou Ann Ziegler also testified at the November 12, 2013 hearing. She was employed during the relevant time as an elementary school guidance counselor and gifted support teacher.

In late February of 2012, she was approached by a teacher and asked to speak with the child to "find out what was going on." The child was brought to her office during lunch, and Ms. Ziegler and the child talked.

The child indicated that she had a "top secret," that her mommy did not know about it and that her mommy would be mad. She indicated that it took place in her mother's and "Chad's room while her mother was sleeping downstairs on the couch."

When asked if it involved touching, she indicated yes. When asked if it involved inappropriate touching, she also said yes. When she was asked if it involved anything other than hands, she pointed to her mouth.

Ms. Ziegler indicated that with respect to the child, she appeared relaxed and used "typical terminology." She noted that she and the child had a rapport. The child was never in her office for any punitive issues and at the time did not think that she was in any trouble at all. The child appeared to be certain in her statements and, as best as possible, Ms. Ziegler tried to avoid leading questions. The discussion lasted about three to five minutes.

Kyle Mowrey also testified at the November 12, 2013 hearing. He is a teacher at the Central Elementary School in South Williamsport. On February 24, 2012 at the end of the day the child, one of his students, approached him and

said she had a "secret" with her "stepfather." She could not tell him the secret.

The following Monday she approached him again about the "secret." She indicated she was not allowed to tell teachers, her mom or her friends. She did not say anything about the specifics of the secret. Mr. Mowrey decided to contact Ms. Ziegler to have the child speak with her.

Josh Smeal, the child's father also testified at the November 12, 2013 hearing. He indicated that the child recently turned eight on July 24. In February of 2012, she lived with her mother and defendant, her stepfather.

Since the incident and in connection with either recalling the incident or testifying about it, he has seen changes in the child's behavior and demeanor. Generally, she is very outgoing and talkative, but that is not the case when it comes to talking about defendant, the incident or court hearings.

The child had recently gone to a conference in the district attorney's office. The child was very active in discussions until the conversation turned to the alleged incidents. At that time, the child totally "clammed up." When the discussion turned to defendant and a potential trial, the child's "entire demeanor shifted." She "totally closed down." She refused and/or failed to respond to questions. She did a lot of shrugging and would not talk. When the conversation turned to other things, she "again spoke freely."

Mr. Smeal has serious doubts that the child would be able to communicate in court. While she is very intelligent

and has opened up before, such as to a physician, an attorney and even at the preliminary hearing, he does not believe she would be able to testify now.

The child was in counseling although not any longer because of the "home-living situation." Mr. Smeal was instructed by the child's counselors not to talk to the child about the incident.

Julie Welliver, who was employed by Wise Options, also testified at the November 12, 2013 hearing. Sergeant Taylor contacted her "as soon as it happened." The child's mother brought the child into Ms. Welliver to "prepare her for court."

Ms. Welliver met with the child approximately five times before the preliminary hearing. During that time, she tried to prepare the child for the preliminary hearing and did a program called "Healthy Touch," which is a five-week process. In the first two sessions, the child would talk about normal things, but would get nervous and start to freeze up when they would talk about the incident. In the third or fourth session, the child gave some limited information. Ms. Welliver and Sergeant Taylor also took the child to the District Justice's office about a week before the preliminary hearing to do a "dry run."

The child typically would give yes or no answers. Initially, she would say I don't know. The child would identify body parts. They would go over books about appropriate and inappropriate touch. Ms. Welliver asked the child if anything like that happened to her. The child said yes, and she eventually said that she had to touch

defendant's private part with her hand.

Ms. Welliver did not see the child again until the child's father brought her for three sessions between January and the end of February 2013. Ms. Welliver indicated that as of February 2013, the child got a terrified "deer in the headlights" look when Ms. Welliver tried to discuss the incident with her. Ms. Welliver opined that the child would not be able to communicate in court and that she "absolutely" thinks it would cause severe emotional distress to the child if she were put in the situation that she was required to testify in court.

The purpose of the meetings was to see how the child was doing "with her feelings, to see if she could still communicate what happened and in order to determine if other incidents happened."

While the child could not communicate about the incident when Ms. Welliver last saw her, she was of the opinion that a referral to a therapist or clinical psychologist would be appropriate. In detailing what emotional distress the child may suffer if required to testify, Ms. Welliver indicated that she would clam up, her face would redden, her eyes would become real big, and she would refuse to talk and/or say she did not remember what happened to her. She elaborated that it could very well cause additional stress and behavioral problems. She indicated that it is in fact a "trigger for a lot of kids." In explaining what the child's motivation may be, Ms. Welliver noted that, once the child disclosed the incidents, her life became very disrupted. By the child "opening her mouth," her life was turned upside down. She opined that the child may very

well feel that if she keeps her mouth shut, her life may get back in order and she may be able to re-establish a relationship with her mother.

The court also interviewed the child in chambers. The child appeared bright and engaging and would willingly talk about different issues. The child indicated that she knew who Chad was and in fact liked him. She refused to say anything negative about Chad and refused to discuss anything about any alleged improper touching. Consistent with Ms. Welliver's testimony, the child shrugged, changed the topic or simply avoided the question by becoming distracted with something else. In light of the conversation with the child and the court's observations, the court had serious doubts that the child would even be competent to testify.

Sergeant James Taylor of the South Williamsport Police Department testified on March 20, 2014. He was present on March 5, 2013 when the child was interviewed by Ms. Moroz. He indicated that his purpose was as an "observer" in order to determine what took place. He does not recall what was discussed if anything during the interview between he and the others, including but not limited to, Ms. Moroz. He conceded that he was obviously there as a criminal investigator but that no one knew for sure what had happened.

He was also present at the defendant's preliminary hearing on June 25, 2012. Prior to the hearing, the child met with him and the assistant district attorney for the purpose of preparing for testimony. Her father was also present.

She was very nervous and "unable to speak." Her nervousness was "beyond regular nerves." On the stand, he indicated that while she said enough to meet the prima facie standard, it was very difficult for her to testify. He described her as being quiet, "stunted," not able to elaborate, and answering many questions through "nods and shakes" of her head.

Since that time, her demeanor and ability to discuss the incident has "gotten worse." He described her as just being "frozen" when the incident is being discussed.

On October 14, 2013, she was brought to the district attorney's office for an interview prior to a scheduled trial. Prior to discussing the incident, she was very chatty, friendly, outgoing and open with respect to "mundane or everyday conversations." When he and the assistant district attorney tried to discuss the case, however, there was an immediate change in her demeanor. He indicated that she had a fixed stare, was not talking and "seemed incapable of discussing it."

At the meeting were Sergeant Taylor, the victim's father and the assistant district attorney assigned to the case. No one was able to get anything out of her with respect to defendant or the alleged incident. Despite their best efforts, they were unable to get her to speak "even about her feelings."

Defendant called Amanda Wilcox to testify on his behalf. She is the victim's mother. She was present at the June 25, 2012 preliminary hearing. Contrary to Sergeant Taylor, she indicated that when the victim testified at the

preliminary hearing, she was able to answer questions, she was not nervous, she spoke "eloquently" and was not emotional. Generally speaking, she described her child as being very outgoing, very talkative, very friendly, very intelligent and relating well with adults.

On cross, she indicated that her child was "strong in what she said" at the preliminary hearing, that there was no difficulty in getting her to pay attention, she did not give any one-word answers, she was not distracted and answered in complete sentences. The court notes that it does not find Ms. Wilcox's testimony to be credible with respect to how her child testified at the preliminary hearing and what her demeanor was at the preliminary hearing. Her testimony is contrary to all of the other testimony, contrary to the child's behavior records at school and contrary to what the court observed when it met with the child.

Kyle Rude also testified on behalf of defendant. He is an attorney who previously represented defendant. A meeting was arranged at his office so that he could speak with the child.

He found her to be outgoing, talkative, friendly and intelligent. She related well with him.

Significantly, she indicated to him without any prompting or leading questions whatsoever that she made up the story regarding defendant and had in fact not been truthful. She indicated that nothing happened that was inappropriate and that her motive in doing so was because she was angry at her stepfather and wanted to live with

her father.

The Commonwealth seeks admission of the statements to Ms. Dangle, Ms. Moroz, Ms. Ziegler and Mr. Mowry under the Tender Years Hearsay Act (TYHA), 42 Pa. C.S.A. § 5985.1.

Under the TYHA, an out-of-court statement of a child sexual assault victim who is twelve years old or younger, is admissible into evidence in a criminal or civil proceeding if two requirements are satisfied. First, the trial court must find that the evidence is relevant and that the time, content, and circumstances of the statement provide sufficient indicia of reliability. Second, the child must either (1) testify at the proceedings; or (2) be deemed unavailable as a witness.

*Commonwealth v. Walter*, — Pa. — (February 18, 2014); 42 Pa. C.S.A. §5985.1 (a) (2) (i), (ii). However, where a child's hearsay statements are testimonial, the indicia of reliability standard has been rejected as violative of a defendant's confrontation rights. *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004); *Commonwealth v. Allshouse*, 614 Pa. 229, 36 A.3d 163, 175-76 (2012); *In the interest of: N.C.*, 74 A.3d 271 (Pa. Super. 2013).

In determining whether a statement is testimonial, the court must determine the primary purpose of the interrogation.

[A] court must determine whether the primary purpose of the interrogation was to establish or prove past events relevant to a later criminal prosecution. In

making the determination as to the primary purpose of an interrogation, a court first should determine whether the interrogation occurred during the existence of an ongoing emergency, or what was perceived to be an ongoing emergency. Although the existence — actual or perceived — of an ongoing emergency is one of the most important factors, this factor is not dispositive because there may be other circumstances, outside of an ongoing emergency, where a statement is obtained for a purpose other than for later use in criminal proceedings. In determining the primary purpose of an interrogation, a court must also objectively evaluate the circumstances surrounding the interrogation, including the formality and location, and the statements and actions of both the interrogator and the declarant.

*Commonwealth v. Allshouse*, 36 A.3d at 175-76 (citation omitted); *In the Interest of: N.C.*, 74 A.3d at 277.

Further, "where testimonial evidence is at issue, the sixth amendment demands what the common law requires: unavailability and a prior opportunity for cross-examination." *In the Interest of: N.C.*, 74 A.3d at 275 (citing *Crawford*, 541 U.S. at 68).

Defendant argues that the statements to Ms. Dangle, Ms. Moroz, Ms. Ziegler and Mr. Mowry were all testimonial. Defendant argues that the primary purpose of each of the interrogations was to establish or prove past events relevant to a later criminal prosecution. While conceding that an initial purpose may have been to address a perceived emergency, the main purpose was to establish

criminal events for later prosecution.

With respect to the statements made to Mr. Mowry and Ms. Ziegler, the court does not hesitate in finding that they were non-testimonial in nature. The discussions occurred during the existence of an actual or perceived emergency relating to allegations of abuse. While the statements, in retrospect, may be used in a later criminal proceeding, they were not obtained for that purpose. The discussions took place in a school setting that was familiar to the victim, the discussions were informal, no police officers were present and the actions of both the victim and the respective school personnel when evaluated objectively point to adults addressing an immediate concern for the health and safety of the child.

With respect to Ms. Dangle, defendant concedes that while the first interview at the school may have been non-testimonial, the second interview at the agency's office clearly was testimonial. The court cannot agree.

The whole purpose of Ms. Dangle's meeting and interviewing the child was to determine if an incident occurred and if so, whether the child was in danger. Clearly, it was an emergency situation. The first interview occurred at the school and immediately after the agency was contacted by school personnel. It was informal and clearly designed to protect the child's interests. The second meeting had the same purpose. Indeed, it was incumbent on Ms. Dangle to conduct the second meeting because at the first meeting, the child was not entirely forthcoming, seemed to be particularly emotional and wasn't willing or able to fully communicate all of the details. Again, while

the court recognizes that the statements in retrospect are intended to be used at a future criminal proceeding, this does not mean that the initial interrogation was not for the primary purpose of addressing an emergency. Moreover, the court concludes that the primary purpose was not to establish or prove past events relevant to a later criminal prosecution.

With respect to Ms. Moroz, the Commonwealth argues that this was essentially a first responder interview. The Commonwealth contends that at "the point" of the interview no one had a clear picture of what happened, the child was not "talking enough," that Children and Youth wanted to determine if anything else was going on, that the child only gave bits and pieces, and that the purpose was to determine what occurred to ensure the safety and welfare of not only the alleged victim, but also her one year-old sibling who apparently was still in the home.

While the court sees some merit to the Commonwealth's argument, the test is whether the primary purpose of the interrogation was to establish or prove past events relevant to a later criminal prosecution. In this case, the interrogation did not take place during the existence of an ongoing emergency or what was perceived to be an ongoing emergency. The child was removed from the home and in a safe environment. While there may have been a dual purpose in obtaining the statement, it cannot be concluded that the primary purpose was for a purpose other than for later use in a criminal proceeding.

The father took the child to the Child's Advocacy Center. Also present at the center were a children and

youth representative, a member of the multi-disciplinary team, and a representative from law enforcement.

Ms. Moroz conducted a forensic interview of the alleged child victim. The purpose of the interview was to have a conversation with the child in a non-leading format to determine if something happened. Ms. Moroz indicated that there was not an ongoing emergency and that the purpose was to determine past events. She conceded that the purpose was to establish or prove these past events and that they may be potentially relevant to later proceedings.

Her interview of the child was not only being videotaped but also being simultaneously watched by the other members of the "team." She acknowledged that during the interview, she "paused" or stepped out and consulted with the team members to see if there was anything that needed to be clarified or something else that needed to be asked.

The interview took place on March 5, 2012 approximately a week after the alleged most recent incident. There was no evidence that it took place during the existence of an ongoing emergency. There also is no evidence that the statements were obtained for a purpose other than later use in a criminal proceeding. There does not appear to be any evidence that the statements were used for treatment purposes.

The interview was conducted in an informal setting but it was conducted as part of a criminal investigation and in consultation with law enforcement officials.

It is clear that defendant did not have the opportunity to cross-examine the victim during the interview. It is further

true that the forensic interview was testimonial in nature. Finally, the Commonwealth has indicated that it does not intend to call the victim as a witness at trial and therefore she is unavailable. Accordingly, the court concludes that the admission of the statements to Ms. Moroz would violate defendant's right of confrontation and shall not be admitted. *See, Interest of N.C., supra.*

The court will next address the statements to Kyle Mowry. By its terms, the statute permits hearsay statements that describe certain enumerated offenses. The court finds that the statements to Mr. Mowry do not describe any enumerated offense. The victim simply told Mr. Mowry that she had a secret with her stepfather and that she could not tell him. She indicated that she was not allowed to tell teachers, her mother or friends.

While the Commonwealth argues that these statements described an offense, they have not provided the court with any case or statutory support. The Commonwealth alleges that the unlawful contact is of a sexual nature and that defendant intentionally contacted the child waking her up in the middle of the night and giving her verbal instructions for the purpose of engaging in sexual activity. The child, however, did not provide any of those details to Mr. Mowry; she only told him that she had a secret. Accordingly, the court will not permit the Commonwealth to admit the hearsay statements of the child to Kyle Mowry.

The court will next address the statements to Lou Ann Ziegler and Melissa Dangle. The court finds that certain statements were made to these individuals by the child describing certain enumerated offenses. The court further

finds that these statements are relevant and that the time, content and circumstances of them provide sufficient indicia of reliability. The statements were spontaneous, there was consistency and repetition, the conversations took place between a child and trusted adults in a safe setting, the child used terms that would be expected in a child of her age, and there was no motive to lie or fabricate.

Relying upon the testimony of attorney Rude, defense counsel argues that because the child went to see Mr. Rude on May 18, 2012 and told him that she was not really sure that the incident happened with the defendant and that she thought it may have been a dream or that it seemed "fake a little bit," her reliability earlier is in question. A review of the testimony of Mr. Rude, as well as the transcript of the interview between him and the child, however, does not reveal any recantation by the victim or any clear statement that the incident never occurred. In fact, it is as likely that the child may have been manipulated and/or pressured from the date that she first made her statements to the date that she spoke with Mr. Rude. Moreover, subsequent to the meeting with Mr. Rude, the child testified at the preliminary hearing consistent with her prior statements.

The court also finds the testimony of Sherry Moroz credible. She testified again on March 20, 2014. She indicated that she reviewed the transcript of the interview between Mr. Rude and the victim, and that the interview technique was flawed. The questions were suggestive and leading. She indicated that it was a "perfect example of how not to interview a child." Moreover, and perhaps determinatively, she clearly noted that the child's

statements to Mr. Rude cast no doubt on the reliability of what the child said to her and the others initially. She expounded that she had no concerns about whether the child was being truthful or whether the child's reliability was at issue. She further testified that she had no concerns that the child may have been pressured previously.

Under all of the circumstances, the court finds that with respect to the statements to Ms. Ziegler and Ms. Dangle, there were "particularized guarantees of trustworthiness surrounding the circumstances under which the statements were uttered to the person who [was] testifying." *Walter, supra* at 16, citing *Commonwealth v. Delbridge*, 855 A.2d 27, at 45 (Pa. 2003).

The final issue to be determined in connection with the statements made to Ms. Dangle and Ms. Ziegler is whether the child is deemed to be unavailable as a witness.

In order for the child to be deemed unavailable as a witness, "the court must determine, based on evidence presented to it, that testimony by the child as a witness will result in the child suffering serious emotional distress that would substantially impair the child's ability to reasonably communicate." 42 Pa. C.S.A. § 5985.1 (a. 1); *Walter, supra* at 18.

As provided in the statute, the court observed and questioned the child outside of the courtroom and heard testimony from the child's parents, as well as others who have dealt with the child in a therapeutic setting. 42 Pa. C.S.A § 5985.1 (a.1) (1), (2). Clearly, the child exhibited an increased unwillingness to speak about the alleged

incidents. Contrary to her normal gregarious, open, and fun-loving disposition, her demeanor dramatically changes when she is placed in a situation where she is requested to discuss the alleged incidents. In essence, she refuses to not only talk about the incident, but to even acknowledge the questions. She becomes completely non-verbal, shrugs her shoulders, ignores the questions, evades answering, and more or less shuts down. She experiences physical symptoms including nervousness, a reddened face, and blank, far away staring eyes.

While the situation involving the child is not exactly like the child in the Walter case, it is somewhat similar. The difficulties that both children have experienced include severe negative reactions and freezing up upon discussing the instances of abuse.

In light of the above referenced discussion, the court will enter the following order.

## ORDER

And now, this 27th day of March 2014, following hearings and upon consideration of the relevant statutory and case law, the court grants in part the Commonwealth's motion to admit certain statements.

The court will admit the hearsay statements that the child made to Lou Ann Ziegler and Melissa Dangle about Chad touching her and the child pointing to her mouth when she was asked if any other body parts were involved.

The court will not admit the hearsay statements that the child made to Kyle Mowry or Sherry Moroz.