J-A06002-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DESHAWN NELSON | : | |
| | : | |
| Appellant | : | No. 1205 WDA 2019 |

Appeal from the Judgment of Sentence Entered June 28, 2018
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0013075-2012

BEFORE:  BENDER, P.J.E., LAZARUS, J., and McCAFFERY, J.

MEMORANDUM BY BENDER, P.J.E.:               **FILED:  May 24, 2021**

Appellant, Deshawn Nelson, appeals *nunc pro tunc* from the aggregate judgment of sentence of life imprisonment, followed by 15 to 30 years' incarceration, imposed after a jury convicted him of first-degree murder, attempted murder, aggravated assault, and recklessly endangering another person.  On appeal, Appellant challenges the sufficiency of the evidence to sustain his murder conviction, and argues that the trial court erred by precluding him from asking a Commonwealth witness about the terms of the witness's probationary sentence.  After careful review, we affirm.

The trial court summarized the evidence presented at Appellant's trial, as follows:

> The evidence adduced in this matter established that the victim, Daimond Hill, died from a gunshot wound to his chest on August 26, 2012.  He was found lying outside his home at 404 Curtin Avenue in the Beltzhoover section of the City of Pittsburgh.

Aaron Camp testified in this case that he was a childhood friend of Daimond. On August 17, 2012, Mr. Camp and Daimond were together on Kingsboro Street in the Beltzhoover section of the City of Pittsburgh driving around in Mr. Camp's Jeep. Mr. Camp had pulled over to the side of the street to speak with friends. While they were stopped, Mr. Camp testified that he observed [Appellant], whom he knew as "Deemo," approach the Jeep and fire multiple gunshots toward the Jeep. Daimond suffered bullet wounds to his hand. Mr. Camp drove the victim to his house and left him in the care of his mother. Daimond's mother, Jamel Hill, took him to the hospital.

Jamel Hill testified that she knew who [Appellant] was prior to August 17, 2012, but she did not know him personally. She testified that she took Daimond to the hospital after he was shot in the hand on August 17, 2012. She further testified that on August 25, 2012, she was driving her blue SUV near her home with her other son in the passenger seat. As she approached the stop sign at the top of the hill near her residence, she observed [Appellant] running toward her vehicle with his hand extended. Her younger son had been adjusting the radio at the time. While in her SUV near her house, she received a phone call from Daimond asking her if she was alright because he heard gunshots fired in the neighborhood. Police were called to the scene. The subsequent police investigation disclosed that Ms. Hill's SUV had a flat tire from bullet holes and the body of the vehicle also sustained bullet holes. Nine-millimeter shell casings were found in the area from which [Appellant] fired his gun.

Ms. Hill further testified that on August 26, 2012, the day after she was shot at by [Appellant], she wanted Daimond to leave the house for his own safety. They agreed that Daimond would call a "jitney" which would take him to another safe residence.[1] Because the cell phone service signal is weak in their home, she believed Daimond went outside to call a jitney to pick him up. Shortly after he went downstairs, Ms. Hill heard gunshots. She began to scream. She ran to the bathroom window of her residence and looked outside. At first, she saw nobody. However, she [then] saw [Appellant] running up the street carrying a gun. As she was screaming, [Appellant] turned around and looked directly at her. Ms. Hill then ran downstairs and outside. She went to Daimond and held him until police arrived. He was pronounced dead at the hospital.

_____

[1] A "jitney" is a private taxi service.

Ms. Hill testified that she clearly saw [Appellant's] face just after the shooting. She had also previously identified him in a pre-trial photo array. Nine-millimeter shell casings were found just in front of 410 Curtin Avenue. The shell casings recovered on August 25, 2012[,] and the shell casings recovered on August 26, 2012[,] were determined to have been fired from the same gun.

Paula Meyers testified that she was on the second floor of her house on August 25, 2012. Her house was located on Cedarhurst Avenue which was adjacent to Curtin Avenue. While she was sewing, she looked out her window and observed a blue SUV driving up Curtin Avenue towards Cedarhurst Avenue. She lost sight of the blue SUV but immediately heard gunshots just after she saw the blue SUV turn onto Cedarhurst. She looked out of the window and saw [Appellant] standing on the corner of Cedarhurst Avenue and Curtin Avenue and shooting at the blue SUV. [Appellant] was wearing a white t-shirt, green khaki cargo shorts and white tennis shoes. She then went downstairs and called the police. Police officers arrived and she reported her observations to them.

The following day, August 26, 2012, Ms. Meyers was again on the second floor of her residence sewing. She was facing the back window of her house and observed [Appellant] walking down Freeland Street with another person. The other person was wearing white pants. She watched the two men hide behind some "weeds" as a vehicle passed them. The two men began walking down the alley and she observed [Appellant], wearing the green shorts and white t-shirt, holding a gun in his left hand. [Appellant] put the gun in his pocket and the two men continued to walk "down the cut." Both men hid behind a bush and were looking down toward Curtin Avenue. Ms. Meyers then began to write a description of the other man in the white pants so she could provide it to the police. When she looked back out the window, she did not see the man in the white pants. She did, however, see [Appellant] run down Curtin Avenue toward a blue car. He had the gun in his hand at the time. She lost sight of [Appellant] but immediately heard six to eight gunshots. She then ran downstairs and called the police. She soon heard a woman screaming, "help me, help me! They killed my baby!" Ms. Meyers identified [Appellant] as the person she saw with the gun. Ms. Meyers worked at a local recreation center and she knew [Appellant] because he was a past visitor at the center. Ms. Meyers originally refused to identify [Appellant] as the person she

- 3 -

observed because she was fearful of retaliation. Detectives seized green shorts from [Appellant] during the investigation of this case. Ms. Meyers identified the shorts [as those] that [Appellant] wore on August 25, 2012[,] and August 26, 2012[,] in court. Those shorts contained gunshot residue on them.

Trial Court Opinion (TCO), 7/15/20, at 2-5.

Based on this evidence, Appellant was convicted of the above-stated offenses.[1] On June 29, 2018, he was sentenced to the aggregate term set forth *supra*. Appellant did not file a post-sentence motion or a direct appeal. However, he later sought the reinstatement of his appeal rights via a timely petition under the Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-9546. The court granted that petition, and Appellant filed the present *nunc pro tunc* appeal. He also complied with the trial court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, and the court filed its Rule 1925(a) opinion. Herein, Appellant states two issues for our review, which we have reordered for ease of disposition:

I. Whether there was sufficient evidence to convict Appellant of [f]irst-[d]egree murder?

II. Whether the trial court erred and/or abused its discretion by prohibiting the defense from asking Aaron Camp [about] the terms of his probation?

Appellant's Brief at 5.

To begin, we note our standard of review of a challenge to the sufficiency of the evidence:

_____

[1] We note that this was Appellant's third jury trial. His first two trials ended in mistrials because the jury could not reach a verdict. **See** Appellant's Brief at 6-7; Appellant's Reply Brief at 2.

- 4 -

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. ***Commonwealth v. Moreno***, 14 A.3d 133 (Pa. Super. 2011). Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. ***Commonwealth v. Hartzell***, 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt. ***Moreno, supra*** at 136.

***Commonwealth v. Koch***, 39 A.3d 996, 1001 (Pa. Super. 2011).

Here, Appellant avers that the Commonwealth failed to present sufficient evidence that he was the person who shot Daimond Hill and, therefore, his conviction for first-degree murder must be reversed. Appellant contends that the two witnesses to the crime, Paula Meyer and Jamel Hill, provided inconsistent and incredible identifications of Appellant. First, in regard to Ms. Meyer, Appellant contends that her present "testimony wholly contradict[ed] her testimony from previous trials to fit the narrative that Appellant was the killer." Appellant's Brief at 29. However, Appellant offers no explanation of how Ms. Meyer's testimony was inconsistent trial-to-trial.

Appellant also claims Ms. Meyer's identification was insufficient because she did not actually see the shooting. However, Ms. Meyer did see Appellant holding a gun and running toward the victim's home just before multiple gunshots rang out. Ms. Meyer also saw Appellant shooting at Jamel Hill's vehicle the day prior. Clearly, this was strong circumstantial evidence that Appellant was the person who shot the victim, even though Ms. Meyer did not actually see Appellant pull the trigger.

We also reject Appellant's argument that Ms. Meyer's identification should have been deemed incredible because she did not immediately identify Appellant. Ms. Meyer explained that her delay in identifying Appellant was due to her fear of retaliation. While Appellant claims the jury should have disbelieved this explanation because there was no evidence that he ever actually threatened Ms. Meyer, it is obvious that she could have feared retaliation despite never being explicitly threatened. Thus, this argument is meritless.

Appellant also avers that the jury should have disbelieved Ms. Hill's testimony that she saw Appellant fleeing from the shooting scene. He claims that Ms. Hill has a "personal bias" against Appellant based on her "unsubstantiated belief that Appellant or his group of friends burglarized her home four (4) months prior to the murder." *Id.* at 32, 33. Although Ms. Hill did testify that she suspected Appellant was involved in burglarizing her home, the jury was still free to believe her testimony that she identified Appellant because she locked eyes with him as he fled the scene of her son's murder.

Appellant also focuses on the fact that Ms. Hill did not identify Appellant as the shooter on the day her son was killed, but only did so from a photo array shown to her several days later. According to Appellant, her late identification was made only because "people in the community started telling her Appellant was involved in the murder." *Id.* at 33. The record does not support this claim. On cross-examination at trial, Ms. Hill **denied** that she had heard from people in the community that Appellant was the shooter. ***See***

N.T. Trial, 3/28/18, at 163 ("Nobody was telling me that [Appellant] was the one."). While Ms. Hill did testify that **the police** had heard from community members that Appellant shot her son, **id.**, there was no indication that the police told Ms. Hill this fact, or that she knew it before she identified Appellant. **Id.** Rather, Ms. Hill unequivocally testified, "I looked [Appellant] in the face right there at 404 Curtin, and that's how I know he killed my son." **Id.** The jury was free to credit this testimony.

Finally, Appellant claims that Ms. Meyer's and Ms. Hill's identifications should not have been believed because their description of the shooter did not completely match. Specifically, Ms. Meyer said the shooter was wearing cargo shorts, while Ms. Hill said he was wearing jeans. **Id.** at 35. This inconsistency is not significant. After the shooting, police found cargo shorts with gunshot residue on them in Appellant's home, thus supporting Ms. Meyer's description and indicating that Ms. Hill's was mistaken. However, Ms. Hill only tentatively testified that she **believed** Appellant had on jeans, and her inaccuracy in this regard was understandable, given that she observed Appellant as he fled her home after shooting her son, and she was focused on his face as the two made eye contact.

In sum, the arguments presented by Appellant do not convince us that the evidence failed to prove his identity as the shooter. Instead, we agree with the trial court that,

> [w]hile it is clear that no witness in this case specifically saw [Appellant] pull the trigger at the precise time th[at] the victim was shot, the circumstantial evidence of identification was

substantial. Immediately after the victim was shot, [Ms.] Hill looked out of her window and saw [Appellant] running from the area of the shooting, carrying a handgun. As [Ms.] Hill was screaming, [Appellant] turned toward her and she had a clear look at his face. At trial, she clearly identified him running away from the scene. [Ms.] Meyers was also looking out her window … and observed [Appellant in] the area … carrying a gun in his hand. Immediately after [Ms. Meyer heard] … gunshots, she heard [Ms.] Hill crying and screaming that someone had killed her "baby." This [c]ourt believes that these two identifications of [Appellant] running from the scene almost contemporaneously with the gunshots being fired that killed the victim [were] sufficient evidence of identification.

Additional circumstantial evidence linked [Appellant] to the shooting of the [victim]. The evidence at trial established that [Appellant] tried to shoot the victim multiple times during the days prior to August 26, 2012. Aaron Camp testified that he personally observed [Appellant] shoot at the victim while he was riding in Mr. Camp's vehicle on August 17, 2012. Moreover, on August 25, 2012, both [Ms.] Hill and [Ms.] Meyers saw [Appellant] shoot at [Ms.] Hill's vehicle while she was driving and her other son was riding as a passenger. This [c]ourt believes the jury could have reasonably inferred that [Appellant] incorrectly believed that Daimond Hill was inside the vehicle. As set forth above, in evaluating sufficiency, a reviewing court must view the evidence in a light most favorable to the Commonwealth[,] and the credibility determinations of the jury are given deference. For all of the reasons set forth above, this [c]ourt believes that the jury was free to evaluate the identification testimony in this case. Trial evidence established that trial witnesses identified [Appellant] as the person who shot and killed the victim. This claim fails.

TCO at 7-8. Appellant's sufficiency argument does not warrant relief.

In Appellant's second issue, he claims that the court erred by precluding him from questioning Aaron Camp about the terms of his probation. As context for this claim, prior to Mr. Camp's testimony, defense counsel moved for the admission of evidence that Mr. Camp was serving a sentence of probation. *See* N.T. Trial, 3/28/18, at 53. Defense counsel specified that he

wished to ask Mr. Camp "[i]f he's on probation, what he's on probation for, and if he's been promised anything in exchange for testifying for the Commonwealth." *Id.* at 53-54. In response, the Commonwealth argued that Mr. Camp's probationary sentence was inadmissible as his underlying charge of possession with intent to deliver was not a *crimen falsi* offense. *Id.* at 52. The Commonwealth also stated that Mr. Camp had not been promised anything in exchange for his testimony. *Id.* at 53. Ultimately, the court concluded that defense counsel was attempting "a fishing expedition[,]" as there was no indication that Mr. Camp had any "hope of having his term of probation terminated or shortened." *Id.* at 55, 57. When defense counsel replied that he could only know if Mr. Camp hoped for favorable treatment by asking him, the court directed the Commonwealth to "[m]ake the witness available to [defense counsel] so he can ask the witness about that outside of the hearing of the jury." *Id.* at 58. Defense counsel replied that he was "not interested in asking the witness outside of the presence of the jury[,]" and stated that he accepted the court's ruling. *Id.*

Despite this argument and ruling before Mr. Camp took the stand, the court ultimately allowed him to testify that he was on probation. *Id.* at 73. In addition, Mr. Camp testified that he was incarcerated when he first provided information to the police implicating Appellant in the shooting, and that he had been released from prison after the District Attorney wrote a letter to the judge assigned to Mr. Camp's case requesting his release for his protection, in light of the fact he was testifying against Appellant. *Id.* at 77-78. When

Mr. Camp was asked if he had "been promised anything to testify[,]" Camp replied, "No." *Id.* at 83.

Then, on cross-examination, defense counsel asked Camp, "what are the terms of your probation?" *Id.* at 84. When the Commonwealth objected, defense counsel argued "that it goes to the redirect[,]" during which Mr. Camp had stated he had not been promised anything to testify. *Id.* The court sustained the Commonwealth's objection.

Appellant now insists that he should have been permitted to question Mr. Camp about the terms of his probation. Initially, he observes that in *Commonwealth v. Evans*, 512 A.2d 626 (Pa. 1986), our Supreme Court declared that "a prosecution witness may be biased because of the expectation of leniency in some pending matter even when no promises have been made." *Id.* at 632. Thus, the Court held "that the right guaranteed by Art. I Section 9 of the Pennsylvania Constitution to confront witnesses against a defendant in a criminal case entails that a criminal defendant must be permitted to challenge a witness's self-interest by questioning him about possible or actual favored treatment by the prosecuting authority in the case at bar, or in any other non-final matter involving the same prosecuting authority." *Id.*

Appellant argues that under *Evans*, he should have been allowed to question Mr. Camp about the terms of his probation. He insists that, "without knowing the terms and length of the probation, the jury was precluded from considering whether Mr. Camp was likely to receive favorable treatment *ex post facto*. This is a regular practice: to have a witness testify, wait to see

- 10 -

how helpful the testimony proves to be, and then the District Attorney will give favorable treatment." Appellant's Brief at 22. Appellant explains that "[t]he essence of this issue is not that [Mr.] Camp … received favorable treatment," but whether he was "testifying to curry favor by the District Attorney for future favorable treatment." *Id.* at 24. Appellant argues that the terms of Mr. Camp's probation – in particular, the length of his probationary sentence – were "crucial to illustrate to the jury that [Mr.] Camp would expect a lessening of his probation sentence from the Commonwealth…." *Id.*

Appellant's argument is unconvincing. He complains that he was precluded from asking Mr. Camp if he was testifying to garner future favorable treatment, yet he never attempted to ask Mr. Camp that question. He also did not ask Mr. Camp about the length of his remaining probationary term. Instead, Appellant asked Mr. Camp, generally, about the terms of his probation. When the Commonwealth objected, defense counsel only argued that his question "goes to the redirect[,]" without any elaboration on how the terms of Mr. Camp's probation were relevant. N.T. Trial at 84. Moreover, during the argument before Mr. Camp took the stand, defense counsel did not specifically ask to question Mr. Camp about the terms of his probation. Instead, counsel stated that he wished to ask Mr. Camp if he was on probation, and if he had been promised anything in exchange for his testimony. *See id.* at 53-54. Those questions were asked of Mr. Camp.

Ultimately, the trial court found it impossible to "comprehend how the answer to [the] question [about the terms of Mr. Camp's probation] would have been probative of any fact of consequence in this case…." TCO at 13. It also noted that Appellant "offered no proper basis for its admission." *Id.* Given our discussion *supra* and the record before us, we discern no abuse of discretion in the court's decision.

Nevertheless, even if the trial court did err by precluding the at-issue question posed to Mr. Camp, we conclude that the error was harmless. Our Supreme Court has explained:

> It is well settled that "an appellate court has the ability to affirm a valid judgment or verdict for any reason appearing as of record." ***Commonwealth v. Parker****,* … 919 A.2d 943, 948 ([Pa.] 2007) (citing ***Commonwealth v. Katze****,* … 658 A.2d 345 ([Pa.] 1995) (Opinion in Support of Affirmance)). As we explained in ***Commonwealth v. Thornton****,*
>
>> [t]he doctrine of harmless error is a technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial error was harmless beyond a reasonable doubt. Its purpose is premised on the well-settled proposition that "[a] defendant is entitled to a fair trial but not a perfect one."
>
> … 431 A.2d 248, 251 ([Pa.] 1981).

***Commonwealth v. Allshouse***, 36 A.3d 163, 182 (Pa. 2012).

In this case, even had Appellant been permitted to admit evidence showing that Mr. Camp was testifying in the hopes of receiving favorable treatment, we are convinced, beyond a reasonable doubt, that the verdict would have remained the same. The trial court's summary of the evidence

presented at trial, and our analysis of Appellant's sufficiency claim, demonstrate that there was ample circumstantial evidence, aside from Mr. Camp's testimony, that established Appellant's guilt. Accordingly, even if the court improperly precluded evidence of Mr. Camp's probation terms, that error was harmless.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/24/2021