J-S10026-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DERRICK SANTRYAL MYERS | : | |
| | : | |
| Appellant | : | No. 463 MDA 2024 |

Appeal from the Judgment of Sentence Entered December 8, 2023
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0005380-2022

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DERRICK SANTRYAL MYERS | : | |
| | : | |
| Appellant | : | No. 464 MDA 2024 |

Appeal from the Judgment of Sentence Entered December 8, 2023
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0002033-2022

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DERRICK SANTRYAL MYERS | : | |
| | : | |
| Appellant | : | No. 466 MDA 2024 |

Appeal from the Judgment of Sentence Entered December 8, 2023
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s): CP-36-CR-0002032-2022

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |

```
                                      :
      v.                              :
                                      :
                                      :
                                      :
   DERRICK SANTRYAL SUAVE MYERS       :
                                      :
      Appellant                       :     No. 469 MDA 2024
```

Appeal from the Judgment of Sentence Entered December 8, 2023
In the Court of Common Pleas of Lancaster County Criminal Division at
No(s):  CP-36-CR-0002619-2022

BEFORE:  BOWES, J., OLSON, J., and SULLIVAN, J.

MEMORANDUM BY OLSON, J.:                          **FILED: MAY 21, 2025**

Appellant, Derrick Santryal Myers, appeals from the judgment of sentence entered December 8, 2023, as made final by the denial of his post-sentence motion on February 29, 2024.  We affirm.

On April 21, 2022, Amber Myers, Appellant's wife,[1] awoke at approximately 3:00 a.m. to discover that her bedroom door was blocked by a food storage cabinet and metal dumbbell weights.  After significant effort, Ms. Myers opened her bedroom door and encountered Appellant.  Because Appellant had barricaded Ms. Myers in her bedroom before, Ms. Myers confronted Appellant, resulting in a hostile interaction between the two.  Later that day, Ms. Myers reported the incident to the police.  In addition, Ms. Myers applied for and was granted a protection from abuse order ("PFA") against

---

[1] At trial, Amber Myers revealed that she and Appellant were in the process of obtaining a divorce.  **See** N.T. Trial, 8/7/23, at 185-186.  Because we are unaware of the status of their divorce, and because the Commonwealth referred to Amber Myers as "Ms. Myers" during trial and in its brief, we will also refer to her as Ms. Myers for the sake of consistency.

Appellant, which excluded him from their home and gave her temporary custody over their minor children. In light of the aforementioned incident, Appellant and Ms. Myers' daughter, M.M., attended a forensic interview at Lancaster County Children's Alliance on April 29, 2022. M.M. did not lodge any allegations of sexual abuse against Appellant during the April 29, 2022 interview.

On April 30, 2022, Appellant violated the PFA order and entered the family residence at approximately 3:00 a.m. Upon encountering Ms. Myers, Appellant asked her repeatedly if they could "work it out." N.T. Trial, 8/7/23, at 203. Eventually, Appellant left the family residence and Ms. Myers reported the episode to the police. Thereafter, during the evening of April 30, 2022, Ms. Myers received a text message from her pastor revealing that M.M. heard Ms. Myers when she was barricaded in her bedroom on April 21, 2022. The pastor told Ms. Myers to "[a]sk [M.M.] why [Ms. Myers] was locked in the room" on that day. *Id.* at 207. Ms. Myers then questioned M.M. and specifically asked why M.M. was awake in the middle of the night. M.M. stated that she was frequently awake in the middle of the night with Appellant and that the two "watch[ed] videos" or "ma[d]e food." *Id.* at 208-209. Ms. Myers then asked M.M. if "there [was] anything else . . . that goes on while you [are] up at 3[:00] a.m. watching videos while [she was] locked in the room?" to which M.M. responded: "no, no." *Id.* at 209. Then Ms. Myers told M.M. that, when she was 13-years-old, she was sexually abused and that "it happened again and . . . again" but she "did [not] say anything because [she] was too

- 3 -

scared . . . [and] because [she] thought [she] was going to get in trouble." *Id.* Ms. Myers further stated that, because she did not disclose her abuse, the same individual "did it to [her] sister." *Id.* Ms. Myers reminded M.M. that she had "two baby sisters" and that "if there is something going on . . . [M.M.] need[ed] to tell [her]." *Id.* At that time, M.M. "broke and started shaking and crying" and repeatedly stated that "he [was] going to be so mad at [her]." *Id.* at 210. Because M.M. was too upset to speak, Ms. Myers indicated that she would ask M.M. questions and instructed M.M. to not "say anything," if "it happened, but if it did [not] happen, just say it did [not] happen." *Id.* Ms. Myers then asked a series of questions and M.M. non-verbally revealed that Appellant sexually abused her. Based upon this disclosure, M.M. attended another forensic interview at Lancaster County Children's Alliance on May 13, 2022. During this interview, M.M. disclosed that Appellant repeatedly sexually abused her since she was approximately 11 years old.

Based upon the foregoing,

> On April 21, 2022, Appellant was arrested and charged with
> false imprisonment [] at [trial court docket number
> CP-36-CR-0002033-2022 ("2033-2022")] for acts committed
> that same day against victim [Ms.] Myers.[2] On May 5, 2022,
> Appellant was arrested and charged at [trial court docket
> number CP-36-CR-0002032-2022 ("2032-2022")] with the
> offenses of criminal trespass [] and stalking[,] for acts
> committed on April 30, 2022, against the victim [Ms.] Myers.[3]
> On May 29, 2022, Appellant was charged at [trial court docket

---

[2] 18 Pa.C.S.A. § 2903(a).

[3] 18 Pa.C.S.A. §§ 3503(a)(1)(I) and 2709.1(a)(1), respectively.

number CP-36-CR-0002619-2022 ("2619-2022")] with intimidating a witness [] and terroristic threats [] for acts committed on May 2, 2022, against victim [Ms.] Myers.[4] On December 8, 2022, Appellant was arrested and charged at [trial court docket number CP-36-CR-0005380-2022 ("5380-2022")] with rape-threat of forcible compulsion[, two counts of] statutory sexual assault-person under 16[,] involuntary deviate sexual intercourse [("IDSI")] - person under 16[,] unlawful contact with minor[,] rape of a child[, two counts of IDSI with a child,] aggravated indecent assault of child[, two counts of] sexual assault, aggravated indecent assault-person less than 16[,] endangering the welfare of children[,] corruption of minors[, two counts of] indecent assault-person less than 16[,] and simple assault [] for acts committed upon the juvenile female victim M.M. (D.O.B. 12/[ ]/07), [Appellant's biological daughter,] from age 11 through age 14.[5]

On May 12, 2023, the Commonwealth filed a notice of intent to consolidate these four cases for trial, pursuant to Pa.R.Crim.P. 582(b)(2). On Jul[y] 13, 2023, Appellant filed a motion to sever, which was denied by [the trial court] on July 19, 2023.

Trial Court Opinion, 7/19/24, at 1-2 (unnecessary capitalization and footnotes omitted) (footnotes added).

Thereafter,

[a] hearing was held on August 7, 2023, immediately prior to the commencement of trial, to determine whether [] statements made by the [child victim], M.M., during two forensic interviews with a third party[, as well as a statement made to her mother, Ms. Myers,] should be admitted under the [Tender Years Hearsay Act, ("TYHA"), 42 Pa.C.S.A. § 5985.1]. At the hearing, the Commonwealth presented the testimony of the forensic interviewer at the Lancaster County Children's Alliance, Karen Melton[, as well as the testimony of Ms. Myers]. The [trial c]ourt also reviewed the interview videos prior to the hearing.

---

[4] 18 Pa.C.S.A. §§ 4952(a)(2) and 2706(a)(1), respectively.

[5] 18 Pa.C.S.A. §§ 3121(a)(2), 3122.1(b), 3123(a)(7), 6138(a)(1), 3121(c), 3123(b), 3125(b), 3124.1, 3125(a)(8), 4304(a)(1), 6301(a)(1)(i), 3126(a)(8), and 2701(a)(1), respectively.

[Ultimately, the trial court held that the statutory requirements of Section 5985.1 were met and permitted the Commonwealth to introduce both forensic interviews conducted on April 29, 2022 and May 13, 2022. The trial court also allowed Ms. Myers to testify regarding M.M.'s statement.]

*Id.* at 6-7 (footnote omitted).

Ultimately,

On August 10, 2023, following a four-day trial, Appellant was found guilty on all [of the aforementioned] 22 counts. Following the verdict, sentencing was deferred pending a pre-sentence investigation. A further order was entered on August 15, 2023, directing Appellant to undergo an evaluation by the Pennsylvania Sexual Offenders Assessment Board (SOAB) within 90 days from the date of his conviction for purposes of determining whether he qualified as a "sexually violent predator" (SVP) pursuant to the Sex Offender Registration and Notification Act (SORNA), 42 Pa.C.S.A. §§ 9799.10-9799.41.

On December 8, 2023, Appellant appeared before the [trial court] for sentencing[.] The [SOAB] determined that Appellant did meet the criteria of an SVP. Immediately thereafter, Appellant was sentenced [to an aggregate term of 55 to 112 years' incarceration.]

\* \* \*

Restitution in the amount of $5,762[.00] was ordered, plus a lab fee of $625[.00]. Appellant was not eligible for RRRI, but he was made eligible for any other programs that he may qualify for. Appellant was [also] advised at sentencing of his lifetime registration obligations pursuant to SORNA, ***supra***, as a Tier III sexual offender.

Appellant filed a timely post-sentence motion to modify his sentence on December 18, 2023[. The trial court] denied Appellant's post-sentence motion . . . on February 29, 2024. [This timely appeal followed].

*Id.* at 2-4 (footnotes omitted).

Appellant raises the following issue for our consideration.

Did the trial court err in admitting the out[-]of[-]court statements made by [M.M.] to Karen Melton at the Lancaster County Children's Alliance on May 13, 2023 and the out[-]of[-]court [statement] made by[M.M.] to her mother[, Ms.] Myers[,] on April 30, 2022, where the content and circumstances of those statements did not demonstrate sufficient *indicia* of reliability as required [under the TYHA]?

Appellant's Brief at 8 (emphasis added).

This Court previously stated:

In reviewing a trial court's ruling on the admissibility of evidence, our standard of review is one of deference. It is firmly established, "[q]uestions concerning the admissibility of evidence lie within the sound discretion of the trial court, and [a reviewing court] will not reverse the court's decision on such a question absent a clear abuse of discretion." An abuse of discretion requires:

not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will.

***Commonwealth v. Hunzer***, 868 A.2d 498, 510 (Pa. Super. 2005) (internal citations omitted).

"Hearsay" is defined as "a statement that [] the declarant does not make while testifying at the current trial or hearing[, and] a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c)(1) and (2). A "statement" is defined as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Pa.R.E. 801(a). "Hearsay is not admissible except as provided by these rules, by other rules prescribed by the Pennsylvania Supreme Court, or by statute." Pa.R.E. 802.

- 7 -

The TYHA creates an exception to the general rule against hearsay for a statement made by a child, provided the child is "[16] years of age or younger" when the statement is made and the statement relates to, *inter alia*, a sexual offense enumerated in Chapter 31 of the Crimes Code. 42 Pa.C.S.A. § 5985.1(a)(1) and (2); **see also** 18 Pa.C.S.A. §§ 3101-3141. Section 5985.1 of the TYHA states, in pertinent part, as follows:

§ 5985.1. Admissibility of certain statements

**(a) General rule. -**

(1) An out-of-court statement made by a child victim or witness, who at the time the statement was made was 16 years of age or younger, describing any of the offenses enumerated in paragraph (2) [(which included Chapter 31 – sexual offenses)], not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal or civil proceeding if:

(i) the [trial] court finds, in an in[-]camera hearing, that the evidence is relevant and that the time, content[,] and circumstances of the statement provide sufficient indicia of reliability; and

(ii) the child either:

(A) testifies at the proceeding; or

(B) is unavailable as a witness.

42 Pa.C.S.A. § 5985.1(a). As our Supreme Court explained,

the [TYHA] concerns the admissibility of out-of-court statements made by a child victim or witness to third parties. The admissibility of this type of hearsay is determined by assessing the particularized guarantees of trustworthiness surrounding the circumstances under which the statements were uttered to the person who is testifying. To determine

- 8 -

whether a child's out-of-court statements are admissible under the [TYHA], a trial court must assess the [relevance] of the statements and their reliability in accordance with the test enunciated in *Idaho v. Wright*, [497 U.S. 805, 821-822 (1990)]. Although the test is not exclusive, the most obvious factors to be considered include the spontaneity of the statements, consistency in repetition, the mental state of the declarant, use of terms unexpected in children of that age[,] and the lack of a motive to fabricate.

*Commonwealth v. Walter*, 93 A.3d 442, 451 (Pa. 2014).

Herein, Appellant challenges the admissibility, under the TYHA, of statements M.M. made to her mother, Ms. Myers, on April 30, 2022, and statements M.M. made to Karen Melton during a forensic interview on May 13, 2022. Appellant's chief complaint is that the statements lacked sufficient *indicia* of reliability. The trial court, however, held "the circumstances surrounding M.M.'s out-of-court statements combined to provide sufficient *indicia* of reliability" and, as such, it did not err in "ruling that the testimony was admissible under the [TYHA]." Trial Court Opinion, 7/19/24, at 8.

Appellant first challenges the admission of the statement M.M. made to her mother, Ms. Myers. Appellant argues that the statement was "anything but spontaneously made." Appellant's Brief at 16. In support of this claim, Appellant argues that M.M. "did not approach [Ms.] Myers" and, instead, Ms. Myers "pry[ed] information out of [M.M.]" by asking her leading questions. *Id.* Appellant also points to the fact that M.M. did not provide verbal responses to Ms. Myers when asked pointed questions with respect to potential abuse. *See id.* at 17 ("The victim did not respond when [Ms.] Myers

- 9 -

asked if [Appellant] had seen her naked, touched her breasts, performed oral sex on her or penetrated her anally."). Rather, Ms. Myers "interpreted [M.M.'s] non-answers as affirmative answers while asking her about various sexual acts." *Id.*

Next, Appellant challenges the admission of the statement M.M. made to Karen Melton during a forensic interview on May 13, 2022. Again, Appellant claims that this statement was not spontaneous because, after the "pressured nonverbal disclosure" M.M. made to Ms. Myers, Ms. Myers "brought [her] to the Children's Alliance . . . for the [sole] purpose of telling the interviewer what happened to her." *Id.* at 18. Appellant also claims that M.M.'s May 13, 2022 statement was unreliable because she failed to disclose the alleged abuse during an earlier forensic interview, conducted on April 29, 2022, immediately after Ms. Myers obtained a PFA order against Appellant. *Id.* at 18-19. Finally, Appellant argues that the court failed to consider M.M.'s "motive to fabricate" her statement, citing to the fact that, during Ms. Myers' discussion with M.M. on April 30, 2022, Ms. Myers "scared her into thinking that something bad could possibly happen to her sisters" and disclosing her own prior abuse. *Id.* at 20.

We begin our analysis of the trial court's evidentiary rulings by considering the statement M.M. made to her mother, Ms. Myers, on April 30, 2022. Here, the Commonwealth sought to introduce M.M.'s non-verbal responses to Ms. Myers, which revealed that she had been sexually abused by

Appellant. In particular, during the pre-trial hearing, Ms. Myers provided the following relevant testimony:

> **[Commonwealth]:** Ms. Myers, I [am] going to direct your attention for purposes of this hearing to April 30[,] 2022.
>
> On that date, did you have a conversation with [M.M.] that causes you to be sitting here today?
>
> **[Ms. Myers]:** Yes.
>
> **[Commonwealth]:** Can you tell us a little bit, just a little bit of what was happening prior to your having a conversation with [M.M.]?
>
> **[Ms. Myers]:** I had a PFA, and [Appellant] was no longer in the house. And I had been trying to figure out why I had been barricaded in the room.
>
> So at one point, [M.M.] had talked to my pastors. And she was really distraught and really wanted her dad to come home. And she had mentioned . . . [that] she knew I could get out of the room because she heard me. And since it was at, like 3:30 in the morning, it kind of struck me that she had heard me and so –
>
> **[Commonwealth]:** Did you know that?
>
> **[Ms. Myers]:** On that day?
>
> **[Commonwealth]:** Did you know that she heard this incident prior to that date?
>
> **[Ms. Myers]:** No.
>
> **[Commonwealth]:** Sorry. Go ahead.
>
> **[Ms. Myers]:** No, I did [not] know that she knew anything about it.
>
> And so then I was talking to my pastors. And at one point, they texted me and said they felt like I should ask [M.M.] why was I stuck in that room.

So I immediately – it was nighttime and [M.M.] was sitting on the couch reading a book. And all the rest of my kids were pretty much in bed.

So I sat down with her and I asked her, I said, hey, [M.M.], you know, you said that you knew – you told Pastor Sarah you knew that I could get out of the room. How did you know that?

And she said, oh, because I heard you. And I asked her, you know, how did you hear me? She was like, I heard that you could get out.

And I said, so do you know, why I was locked in the room? And she was like, oh, it was to keep [Ms. Myers' son] out [of the room].

And I said, you do [not] need weights and a cabinet to keep a three-year-old out of the room, so what were you doing at 3[:00] in the morning that you heard me? And she said, oh, I was just – I was watching videos with daddy. I said, so you were up at 3:30 in the morning, while I [am] locked in the room, with your dad, just watching videos? She [is] like yeah. Like, okay.

How many times are you up at that time in the morning watching videos? And she said – she looked at me wide-eyed and she says – she's like, a lot.

I said, okay, so you were up at 3:30 in the morning with your dad watching videos. And what else do you do when you [are] up at 3:30 in the morning while I [am] locked in the room? She said, oh, sometimes we make food. Okay.

[M.M.], you [are] up at 3:30 in the morning multiple nights. You [are] tired every morning. You know you have school the next day and I have told you to go to bed, why are you up at that time of night? And she just kept saying that she [is] just watching videos and she just stared at me.

And I said, [M.M.], I [am] going to tell you a story. I said, one time when I was about 13 years old, I had somebody molesting me. And I never told anybody because I was too scared. And so I never said anything. And because I never said anything, this same person went and started to molest my sister.

I said, [M.M.], you have two baby sisters in that room. So if something is going on, you need to tell me right now because I

do [not] want something to happen to your sisters. And I want you to know that no matter what happened, I will never be mad at you. No matter what you tell me, you will never be in trouble with me.

And she kind of broke, like glass. She just started shaking and crying and shaking and crying and saying, he [is] going to be so mad at me, he [is] going to be so mad at me. Over and over, he [is] going to be so mad at me.

I said, okay, [M.M.], what happened? And she would [not] talk at first. I said, I [am] going to ask you questions, and if it [is] true, you do [not] have to say anything. If it happened, you do [not] have to say anything. If it did [not] happen, just say it did [not] happen.

And so the first thing I asked her was, has he ever kissed you? And she said, no, no.

I said, okay, all right. Well, has he ever seen you naked? And she did [not] – she just looked at me. She did [not] respond. I said, okay, so he has seen you naked. And she just did [not] say anything.

And then I said, okay, so are you still a virgin? She [was] like, I think so. I said, okay.

Has he touched you on your breasts? And she did [not] move. She just looked at me. I said okay.

And I said, has he seen you all the way naked? And she did [not] respond. And she did [not] say anything to me.

I asked if she had ever had to do oral sex on him, and she said no. Oh, no, ew, no.

I said, okay, has he ever had oral sex on you? And she did [not] respond. She did [not] say anything.

And then I asked if he had ever penetrated her anally and she just cried and did [not] say anything.

I may not remember ever single question that I asked her, but by the time I was done, I told her that I would have to call the police and the[y would] come, but I would – if she was ready to leave the house, we were going to leave. Her, me, and the

kids, we were going to go somewhere and we were never going to come back to that house again.

And so she ran and packed her stuff really fast and the police came after that.

**[Commonwealth]:** Okay. As far as you know, was this the very first disclosure [M.M.] had made about what happened?

**[Ms. Myers]:** Yes.

N.T. Trial, 8/7/23, at 96-101

The Commonwealth also sought to introduce at trial a recording of an interview the forensic interviewer, Karen Melton, had with M.M. on May 13, 2022. During the interview, Ms. Melton posed "not leading, not suggestive" questions but "age-appropriate" open-ended narrative prompts to enable M.M. "to provide responses in [her] own words . . . in a narrative format." *Id.* at 67-68. In response to Ms. Melton's prompting, M.M. detailed the sexual abuse she suffered. More specifically, M.M. explained that Appellant began sexually abusing her when she was approximately 11 years old. *See* Commonwealth's Exhibit 51. M.M. stated that Appellant would take her from her bedroom, which she shared with her younger sisters, and abuse her throughout the family home, including in the attic. *Id.* M.M. also described the type of abuse she suffered, stating that, initially, Appellant gave her massages, but that the abuse escalated over time and included Appellant touching M.M.'s breasts and genitals, attempting to show his penis to M.M., digitally penetrating M.M.'s anus, engaging in vaginal and anal intercourse with M.M., and performing oral sex on M.M. *Id.* In addition, M.M. stated that the abuse originally occurred two or three times a week, but eventually occurred multiple times a day. *Id.*

Upon review, we hold that the record supports the trial court's conclusion that the statements introduced by the Commonwealth were relevant and showed a sufficient *indicia* of reliability. While Appellant is correct that M.M.'s statement to Ms. Myers was the result of Ms. Myers's prompting, Appellant overlooks the fact that Ms. Myers questioned M.M. because she just learned – for the first time – that M.M. was awake at approximately 3:00 a.m. while, at the same time, Appellant barricaded Ms. Myers in her bedroom. This act, undoubtedly, demonstrated an extreme effort to avoid detection, thereby giving rise to Ms. Myers' suspicion that something nefarious was occurring and, in turn, lends an *indicia* of reliability to M.M.'s statements. Moreover, as the trial court pointed out, "there was no evidence presented to suggest that M.M. had any motivation to fabricate the allegations against Appellant; however, [Ms.] Myers' claim that M.M. said that Appellant would be 'so mad at her' provides some explanation as to why M.M. did not disclose the abuse sooner[,"] *i.e.*, during the April 29, 2022 forensic interview. Trial Court Opinion, 7/19/24, at 8. In considering the totality of the circumstances under which the statements were made, it is apparent that the statements of sexual abuse were consistent and continued to be more forthcoming as M.M. became more comfortable discussing the abuse and came to terms with what occurred to her at the hands of her father. Therefore, we discern no manifest abuse of discretion in the trial court's admission of these statements pursuant to the exception to the rule against hearsay which is expressed in the Tender Years Hearsay Act.

We further note that, even if the trial court did err in admitting the aforementioned statements – which it did not – such an error would be harmless given the overwhelming evidence of Appellant's guilt.[6] Indeed, M.M. testified at trial, specifying the sexual abuse she endured for years. **See** N.T. Trial, 8/7/23, at 148-184. M.M.'s testimony was corroborated by her siblings, who both testified that they saw Appellant take M.M. from her room in the middle of the night and heard loud noises coming from the family residence's attic – the area in which M.M. testified the abuse occurred. **See** N.T. Trial, 8/8/23, at 247-248 (M.M.'s sister testifying that she heard Appellant come into their bedroom at night to take M.M. upstairs and that she heard M.M. crying); **see also id.** at 254 (M.M.'s brother testifying that he heard "some sort of thumping upstairs [in the attic], like middle of the night, around, like 2:00 [a.m.], sometimes later."). Finally, there was evidence that, following a search warrant of the family residence, police discovered a used condom in

---

[6] Our Supreme Court previously stated:

> It is well settled that "an appellate court has the ability to affirm a valid judgment or verdict for any reason appearing as of record." As we explained in **Commonwealth v. Thornton**,
>
> > [t]he doctrine of harmless error is a technique of appellate review designed to advance judicial economy by obviating the necessity for a retrial where the appellate court is convinced that a trial error was harmless beyond a reasonable doubt. Its purpose is premised on the well-settled proposition that "[a] defendant is entitled to a fair trial but not a perfect one."
>
> 431 A.2d 248, 251 (Pa. 1981).

**Commonwealth v. Allshouse**, 36 A.3d 163, 182 (Pa. 2012).

the attic.  At trial, Brittany Lenig, forensic DNA scientist for the Pennsylvania State Police Forensic DNA Division, testified that forensic testing showed that the condom contained Appellant's sperm, as well as a mixture of DNA from Appellant and M.M.  *See* N.T. Trial, 8/8/23, at 553.  Thus, no relief is due.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/21/2025